**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | Case No. 1:23-cv-07485 |
| v. | Hon. John F. Kness |
| LOGISTA ADVISORS LLC and ANDREW HARRIS SEROTTA, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR RULE 12(b)(6) MOTION TO DISMISS
PLAINTIFF'S AMENDED COMPLAINT**

Thomas K. Cauley, Jr. (ARDC No. 6185259)
tom@cauleylawgroup.com
Cauley Law Group LLC
521 Morris Lane
Hinsdale, IL 60521
(312) 493-8970

and

Steven E. Sexton (ARDC No. 6287356)
ssexton@sidley.com
Thomas A. Weber (ARDC No. 6336929)
tweber@sidley.com
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
(312) 853-7000

***Attorneys for Defendants***

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

THE CFTC'S ALLEGATIONS ................................................................................ 6

LEGAL STANDARD............................................................................................... 8

ARGUMENT .......................................................................................................... 10

I.     THE CFTC'S SPOOFING AND MANIPULATION CLAIMS (COUNTS I & II)
DO NOT SATISFY RULE 9(b) AND FAIL TO ADEQUATELY ALLEGE
SCIENTER. ................................................................................................ 10

     A.    Nothing About the So-Called "Large Spoof Orders" Was Different from
Other, Legitimate Orders. ..................................................................... 11

          1.    There Is Nothing Wrong with 200+ Contract Orders. ............................. 11

          2.    There Is Nothing Wrong with Resting Orders. ......................................... 11

          3.    There Is Nothing Wrong with Placing Orders on Both Sides of the
Market in Unequal Quantities. .................................................................. 12

          4.    There Is Nothing Wrong with Orders Ending Up Behind Other
Orders.......................................................................................................... 13

          5.    There Is Nothing Wrong with Canceling Orders. ..................................... 13

     B.    The CFTC's Two Fill Rate Comparisons Do Not Support Manipulation. ........... 15

          1.    The Different Fill Rates of Logista's "Large *Non*-Spoof Orders"
and "Large Spoof Orders" Do Not Support Manipulation. ...................... 15

          2.    The Different Fill Rates of Logista's "Genuine Orders" and "Large
Spoof Orders" Do Not Support Manipulation. ......................................... 16

     C.    The CFTC Has Not Alleged Any Facts to Support Its Conclusory
Assertion That Logista's Orders Had a "Very Low Risk" of Execution. ............. 17

     D.    The Fact That So-Called "Large Spoof Orders" Were in the Market for a
Median of 52 Seconds and as Long as Up to Three Minutes Undercuts the
CFTC's Spoofing Claim. ........................................................................ 17

     E.    The Amended Complaint Does Not Allege What Impact the "Large Spoof
Orders" Purportedly Had on the Market. ................................................ 19

     F.    The CFTC's Five Examples Are Insufficient to State a Spoofing Claim. ........... 20

II.    THE CFTC'S COUNTS III AND IV FOR FAILURE TO SUPERVISE SHOULD
BE DISMISSED. ........................................................................................ 21

CONCLUSION....................................................................................................... 23

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Amaranth Nat. Gas Commodities Litig.*,
 587 F. Supp. 2d 513 (S.D.N.Y. 2008) .................................................................20

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ...............................................................................................8

*Baro v. Lake Cnty. Fed'n of Tchrs. Local 504, IFT-AFT/AFL-CIO*,
 594 F. Supp. 3d 1012 (N.D. Ill. March 28, 2022) (Kness, J.) ..............................23

*Bendtrand Glob. Servs. S.A. v. Silvers*,
 No. 21 C 4684, 2022 WL 3716203 (N.D. Ill. Aug. 29, 2022) ..............................10

*Biggers Holdings LLC v. Garcia*,
 No. 21-CV-4680, 2022 WL 3107617 (N.D. Ill. Aug. 4, 2022) .............................10

*CFTC v. Archegos Cap. Mgmt. LP*,
 2023 WL 6123102 (S.D.N.Y. Sept. 19, 2023) ......................................................23

*CFTC v. Caniff*,
 No. 19-CV-2935, 2020 WL 956302 (N.D. Ill. Feb. 27, 2020) ..............................10

*CFTC v. Chanu*,
 No. 18-CV-00603, 2022 WL 1684552 (N.D. Ill. Apr. 7, 2022) ............................18

*CFTC v. Fintech Inv. Grp., Inc.*,
 No. 6:20-CV-652-WWB-EJK, 2022 WL 1819152 (M.D. Fla. Mar. 24, 2022) .....23

*CFTC v. Garofalo*,
 No. 10 C 2417, 2010 WL 11245430 (N.D. Ill. Dec. 21, 2010) .............................22

*CFTC v. Kraft Foods Grp., Inc.*,
 153 F. Supp. 3d 996 (N.D. Ill. 2015) ....................................................................19

*CFTC v. Nav Sarao Futures Ltd. PLC*,
 No. 15-CV-3398, 2016 WL 8257513 (N.D. Ill. Nov. 14, 2016) ...........................18

*CFTC v. Oystacher*,
 No. 15-CV-9196, 2016 WL 3693429 (N.D. Ill. July 12, 2016) .............................18

*CFTC v. Shak*,
 No. 2:22-CV-01258-GMN-NJK, 2023 WL 5717289 (D. Nev. Sept. 5, 2023) .................9, 18

*CFTC v. Skudder*,
No. 22 CV 1925, 2022 WL 17752392 (N.D. Ill. Dec. 19, 2022) ................................9, 15, 18

*CFTC v. Vorley*,
No. 18-CV-00603, 2022 WL 1681809 (N.D. Ill. Apr. 7, 2022) ..............................................18

*CFTC v. Zhao*,
No. 1:18-CV-00620, 2018 WL 11355243 (N.D. Ill. June 4, 2021)........................................18

*In re Chesapeake Energy Corp.*,
70 F.4th 273 (5th Cir. 2023) ..................................................................................................14

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)....................................................................................................22

*CP Stone Fort Holdings, LLC v. John*,
No. 16 C 4991, 2016 WL 5934096 (N.D. Ill. Oct. 11, 2016) ................................................13

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ....................................................................................................9

*In re EP Energy E&P Co., L.P.*,
No. 19-35647, 2021 WL 5917771 (Bankr. S.D. Tex. Dec. 14, 2021) ....................................14

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
No. 13 CIV. 7789 (LGS), 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016)..............................22

*In re FSI Futures, Inc.*,
2 Comm. Fut. L. Rep. (CCH) ¶ 27,150 (C.F.T.C. 1997) ........................................................21

*Grenadyor v. SN Servicing Corp.*,
No. 21-CV-02980, 2023 WL 2663954 (N.D. Ill. Mar. 28, 2023) (Kness, J.)..........................9

*In re HealthCare Compare Corp. Sec. Litig.*,
75 F.3d 276 (7th Cir. 1996) ......................................................................................................9

*Lachmund v. ADM Inv. Servs., Inc.*,
191 F.3d 777 (7th Cir. 1999) ....................................................................................................9

*In the Matter of Logista Advisors LLC*,
CFTC No. 17-29 (Sept. 29, 2017).............................................................................................8

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010).................................................................................................................22

*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*,
836 F.3d 770 (7th Cir. 2016) ....................................................................................................9

*SEC v. Graham*,
    823 F.3d 1357 (11th Cir. 2016) ........................................................................23

*United States v. Chanu*,
    40 F.4th 528 (7th Cir. 2022) ...........................................................................15

*United States v. Coscia*,
    4 F.4th 454 (7th Cir. 2021) .......................................................................14, 18

*United States v. Coscia*,
    866 F.3d 782 (7th Cir. 2017) ............................................................... *passim*

*United States v. Vorley*,
    No. 18 CR 00035, 2021 WL 1057903 (N.D. Ill. Mar. 18, 2021) ...........................14

*Vranjkovic v. Eldorado Trading Grp., LLC*,
    No. 14 C 6810, 2014 WL 6685960 (N.D. Ill. Nov. 24, 2014) ................................12

*West v. Prudential Sec., Inc.*,
    282 F.3d 935 (7th Cir. 2002) ...........................................................................11

**Statutes**

7 U.S.C. § 6c(a)(5)(C) ...........................................................................................9

**Other Authorities**

17 C.F.R. § 166.3 .................................................................................................22

CME Group Market Regulation Advisory Notice RA2107-5 (Aug. 2, 2021) .............................12

Gideon Mark, *Spoofing and Layering*, 45 J. Corp. L. 399 (2020) ................................13

## INTRODUCTION

The CFTC's Amended Complaint does not even attempt to correct the pleading deficiencies Defendants identified in their original motion to dismiss.[1]  The Amended Complaint merely adds an allegation concerning the median cancellation times of so-called "Large Spoof Orders" and "Large *Non*-Spoof Orders," and provides a nuanced definition of Logista's so-called "Large *Non*-Spoof Orders."  However, the CFTC's claims that Logista engaged in "spoofing" and market manipulation fail under Rule 9(b)'s heightened pleading requirements – which apply because those claims sound in fraud.  The Amended Complaint continues to fail to allege how Logista's allegedly improper trading activity differs from legitimate trading activity and what impact the CFTC believes Logista's "Large Spoof Orders" had on the market.  A redline of the two complaints is attached as Exhibit A.  At this point, the Amended Complaint should be dismissed with prejudice.

The Amended Complaint alleges that Logista's "Large Spoof Orders" contained all of the following elements: (1) they were resting orders to buy or sell 200 or more futures contracts that were behind other orders in the order book, (2) they were opposite smaller orders on the other side of the market (the so-called "Genuine Orders") that were filled or partially filled, and (3) they were canceled (to the extent they were not filled) within three minutes.  But there is nothing wrong with any aspect of this trading activity.  The Amended Complaint fails to allege any facts concerning Logista's "Large Spoof Orders" that meaningfully distinguish those orders from other, legitimate orders, including "Large *Non*-Spoof Orders."

---

[1] As used herein, "CFTC" refers to Plaintiff, the Commodity Futures Trading Commission; "Logista" refers to Defendants Logista Advisors LLC and Andrew Serotta, collectively; "NYMEX" refers to the New York Mercantile Exchange; "CME" refers to the CME Group Inc., which is NYMEX's parent company; "ICE Europe" refers to a commodity exchange based in the United Kingdom; "CEA" refers to the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*

There is nothing wrong with placing orders for 200 or more futures contracts. The Amended Complaint recognizes that Logista properly placed orders for 200 or more futures contracts that were legitimate (the "Large *Non*-Spoof Orders"). Nor is there anything wrong with placing a "resting" order for 200 or more contracts. Indeed, the Amended Complaint alleges that 59.7% of Logista's "Large *Non*-Spoof Orders" were also resting orders. Likewise, the Amended Complaint's allegation that Logista's "Large Spoof Orders" represented the majority of the order volume at a particular price level does not distinguish those orders from "Large *Non*-Spoof Orders." Nowhere does the Amended Complaint allege – likely because it cannot – that the "Large *Non*-Spoof Orders" were not also the majority of the order volume at the relevant price level.

There is also nothing wrong with placing orders on both sides of the market in unequal quantities, as the CME's guidance relating to its anti-spoofing rule specifically recognizes. Indeed, the Amended Complaint acknowledges that Logista properly placed "Large *Non*-Spoof Orders" that were also opposite "Genuine Orders."

While the CFTC alleges that the "Large Spoof Orders" had a "very low risk of filling" because they were behind other orders in the order book, the CFTC does not allege that Logista intentionally placed "Large Spoof Orders" behind other orders. There is nothing wrong with, or unusual about, orders ending up behind other orders. Any order placed at an existing price level will *always* be behind other orders placed earlier at that same price level or at better levels. There is nothing wrong with placing an order at an existing price level, which necessarily means the order will be behind earlier orders in the order book at that same price. Nor is there anything wrong with placing orders at prices that are away from the prevailing best bid or offer, which also necessarily means they will be behind other orders in the order book. While orders that end

up behind other orders may have less chance of being filled (and therefore have a greater chance of eventually being canceled), that is simply how the order book works. The only way to ensure that an order is not behind other orders is to improve on the prevailing best bid or offer that already exists on the exchange's order book – which, of course, Logista is not required to do.

The CFTC's spoofing claim is based upon its contention that Logista believed its "Large Spoof Orders" were highly unlikely to be filled because of the placement of those orders in the order book, but continues to fail to allege any facts to support that conclusory allegation. The CFTC does not allege any facts concerning how quickly orders ahead of Logista's "Large Spoof Orders" were expected to be filled or canceled – allegations that are essential to support an inference that Logista believed at the time it placed the so-called "Large Spoof Orders" that those orders would not move up in the queue and would never be filled. Indeed, the Amended Complaint contains no allegation that the resting "Large *Non*-Spoof Orders" – which account for roughly 60% of all "Large *Non*-Spoof Orders" – were placed any differently in the order book from the resting "Large Spoof Orders." There is no allegation that those resting "Large *Non*-Spoof Orders" were not also behind other orders in the order book, just like resting "Large Spoof Orders."

There is nothing wrong with canceling orders. It is well documented that orders are routinely canceled. Market participants cancel orders for a host of legitimate reasons, such as changes in market conditions. Indeed, the Amended Complaint acknowledges that it is entirely appropriate to cancel orders. Yet, the Amended Complaint never explains why a 200+ contract order is "spoofing" if it is canceled within three minutes when a "Genuine Order" on the other side of the market happens to be filled in whole or in part, but is *not* "spoofing" if it is canceled when a "Genuine Order" on the other side of the market happens not to be filled. Logista could

3

not control whether its "Genuine Orders" were filled, and it makes no sense to arbitrarily declare, as the CFTC does, the 200+ contract orders as "spoofing" if they are canceled within three minutes *only if* "Genuine Orders" on the opposite side of the market are fully or partially filled, but not if there were no fills of "Genuine Orders."

Also, the CFTC never even attempts to explain the significance of canceling an order within three minutes. The CFTC alleges that Logista's "Large *Non*-Spoof Orders" placed opposite "Genuine Orders" were not "spoofing" if the "Large *Non*-Spoof Orders" were canceled *after* three minutes even if "Genuine Orders" on the other side of the market were filled. Why would an order for 200+ contracts that was canceled at or just *under* three minutes be "spoofing" – that is, according to the CFTC, the order was intended to be canceled *at the time* the order was placed – while an order canceled at just *after* three minutes is legitimate, and there was no such intent to cancel at the time the order was placed?

In response to Defendants' original motion to dismiss, the CFTC now alleges that "Large Spoof Orders" were left open in the market for a median duration of 52 seconds whereas the "Large *Non*-Spoof Orders" were left open for a median duration of 3 minutes 8 seconds. But given that the CFTC's definition of "Large Spoof Orders" includes the arbitrary requirement that the order was canceled before three minutes and the definition of "Large *Non*-Spoof Orders" includes all orders that were canceled after three minutes, it is hardly surprising that the two types of "large orders" have different median duration times. Moreover, the CFTC does not allege that there is anything unusual or improper with leaving an order exposed in the market for 52 seconds – which is an eternity in futures trading and well exceeds the median duration time of alleged spoof orders in other cases. In short, the CFTC has failed to allege how Logista's so-called "Large Spoof Orders" differed from legitimate market activity.

The CFTC points to two meaningless fill rate statistics to support its spoofing claim. First, the CFTC alleges that the "Large Spoof Orders" had lower fill rates than the "Large *Non*-Spoof Orders." Of course they did. The CFTC's definition of "Large *Non*-Spoof Orders" necessarily includes all fully filled orders for 200 or more contracts, whereas "Large Spoof Orders" are defined as resting orders for 200 or more contracts that were canceled within three minutes (even though they may have been partially filled).[2] By defining "Large *Non*-Spoof Orders" to include all fully filled orders for 200+ contracts, the CFTC guarantees that "Large *Non*-Spoof Orders" have higher fill rates than "Large Spoof Orders." The CFTC's statistics simply reflect how the CFTC arbitrarily defines "Large Spoof Orders" and "Large *Non*-Spoof Orders."

The CFTC next alleges that because the "Large Spoof Orders" had lower fill rates than "Genuine Orders," Logista must have never intended for the "Large Spoof Orders" to be executed. But again, that difference in fill rates is to be expected because, as the Amended Complaint acknowledges, "Genuine Orders" were mostly "aggressive" orders that the CFTC admits were "*guaranteed* to execute, at least partially, immediately after being placed," whereas the "Large Spoof Orders" were "resting" orders that, according to the CFTC, were "not guaranteed to execute." But, both order types are legitimate methods of entering orders, and the difference in fill rates is simply reflective of the differences in order types. In fact, the "Large *Non*-Spoof Orders" also had lower fill rates (30%) than the "Genuine Orders" (65%).

The Amended Complaint makes the conclusory assertion that Logista's "Large Spoof

---

[2] The CFTC defined a "Large *Non*-Spoof Order" to be any order of 200 or more contracts that is not a "Large Spoof Order." Am. Compl. ¶ 65. Since a "Large Spoof Order" is one that was canceled within three minutes without being fully filled, a "Large *Non*-Spoof Order" is necessarily a 200+ contract order that was fully filled and therefore not canceled within three minutes.

Orders" allowed Logista to execute its "Genuine Orders" in "larger quantities and at better prices than [it] otherwise would have absent the Spoof Orders."  Am. Compl. ¶ 55.  But the Amended Complaint does not allege with *particularity* what effect Logista's alleged scheme had on the market.  The Amended Complaint does not allege what Logista's fill rate on "Genuine Orders" would have been absent the "Large Spoof Orders," or at what price Logista would have executed "Genuine Orders" absent the "Large Spoof Orders."

Finally, Logista left its so-called "Large Spoof Orders" open in the market for up to three minutes – which is an eternity in these fast-moving electronic futures markets.  In contrast, orders in other CFTC spoofing cases were canceled within one second or less.  The CFTC's Counts I and II for spoofing and manipulation should be dismissed because they do not allege particularized facts, as required by Rule 9(b), to distinguish Logista's so-called spoofing from legitimate trading activity.

Counts III and IV, which are based on failure to supervise allegations, should also be dismissed.  The CFTC has not adequately alleged a claim for spoofing, so the CFTC's claim that Logista's failure to supervise allowed the spoofing to occur must fail.  Further, the CFTC claims that Logista failed to supervise trading on ICE Europe.  However, the CEA does not apply extraterritorially to Logista's foreign trading activities on ICE Europe.  Finally, Count IV is based on Logista's purported violation of the "cease and desist" provision of its 2017 settlement with the CFTC for failure to supervise a now-former Logista employee.  However, courts have routinely held that such "obey-the-law" provisions are unenforceable.  Thus, Count IV should be dismissed for that independent reason.

## THE CFTC'S ALLEGATIONS

Andrew Serotta is the head trader, principal, and chief executive officer of Logista Advisors LLC, a Houston-based commodity trading advisor and commodity pool operator.  *Id.*

¶¶ 1–2.  Mr. Serotta's trading is not alleged to be algorithmic; his orders are manually entered. The CFTC alleges that from January to April 2020 Mr. Serotta engaged in "spoofing" approximately 361 times by placing orders for natural gas and crude oil calendar spread futures contracts on the NYMEX with the intent to cancel those orders at the time they were placed.  *Id.* ¶¶ 1, 15–16, 56.  "[O]rders placed in a spoofing scheme are never intended to be filled at all" and therefore "spoofing" requires "an intent to cancel the order *at the time it was placed*."  *United States v. Coscia*, 866 F.3d 782, 795 (7th Cir. 2017) (emphasis in original).

The CFTC alleges that Logista engaged in spoofing and manipulation (Counts I and II) by:

> (1) plac[ing] one or more large resting orders (*i.e.*, of 200 contracts or more) on one side of the market, which [Logista] intended to cancel ("Spoof Orders"); (2) placing one or more smaller orders (aggressive, resting, or both) on the opposite side of the market overlapping in time with the Spoof Order, which [Logista] intended to execute ("Genuine Orders"); (3) executing (*i.e.*, obtaining fills for) some Genuine Orders; and (4) canceling the Spoof Orders shortly thereafter (*i.e.*, within three minutes of their entry).

Am. Compl. ¶ 53.  In contrast, the CFTC also alleges that Logista placed legitimate "Large *Non-Spoof Orders*," which the Amended Complaint newly-defines as:

> orders of 200 contracts or more for which at least one of the conditions of a Spoof Event Order, as defined in Paragraph 53, is not satisfied. In other words, an order of 200 contracts or more would be a Large, Non-Spoof-Event Order if it was entered aggressively (*i.e.*, did not rest on the order book), did not overlap in time with at least one opposite-side order that filled, or rested for more than three minutes.  For example, 40.3% of Large, Non-Spoof-Event Orders were entered aggressively and therefore do not qualify as Spoof Orders, as alleged in this Amended Complaint.

*Id.* ¶ 65 n.3.  Thus, the CFTC alleges that Logista placed both legitimate and purportedly illegitimate orders for 200+ contracts opposite "Genuine Orders."  The CFTC alleges that Logista's 200+ contract orders opposite "Genuine Orders" were *not* spoof orders under four different circumstances, namely, if the 200+ contract order:

    (1)    was an aggressive order (that is, an order that crosses the bid-ask spread and therefore is "guaranteed" to execute in whole or part);

    (2)    was a resting order, if that resting order was canceled within three minutes but none of the "Genuine Orders" opposite that resting order were filled;

    (3)    was a resting order that was fully filled within three minutes even if the "Genuine Orders" opposite that resting order were filled; or

    (4)    was a resting order that was canceled after three minutes even if the "Genuine Orders" opposite that resting order were filled.

In other words, the CFTC alleges that a 200+ contract order opposite a "Genuine Order" is spoofing *only if* the 200+ contract order was a resting order that was canceled within three minutes and, during the period that the order was in the market, one or more "Genuine Orders" on the opposite side of the market were filled or partially filled.

The CFTC alleges in Count III that "Defendants were able to engage in disruptive trading practices" on the NYMEX and ICE Europe because Logista lacked an adequate supervisory system. *Id.* ¶ 117. In Count IV, the CFTC alleges that Logista's failure to supervise violates a 2017 settlement agreement related to trading by a former Logista employee that occurred over nine years ago in August 2014,[3] in which Logista agreed to "cease and desist" from violating the CFTC's supervisory regulation. *Id.* ¶¶ 25–30, 120–25. Logista consented to the entry of that settlement order "[w]ithout admitting or denying the findings or conclusions [t]herein." *Id.* ¶ 26.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, the Amended Complaint "must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Because Counts I and II for spoofing and manipulation sound in fraud, they are subject to Rule 9(b)'s heightened pleading requirement. Am. Compl. ¶ 4

---

[3] Order Instituting Proceedings, *In the Matter of Logista Advisors LLC*, CFTC No. 17-29 (Sept. 29, 2017), https://www.cftc.gov/sites/default/files/idc/groups/public/@lrenforcementactions/documents/legalpleading/enflogistaorder09292017.pdf.

(alleging that Logista engaged in "fraudulent and manipulative acts and practices in violation of . . . 7 U.S.C. §§ 6c(a)(5)(C), 9(1), and Regulation 180.1(a)(1) and (3)."); *CFTC v. Skudder*, No. 22 CV 1925, 2022 WL 17752392, at *6 (N.D. Ill. Dec. 19, 2022) ("undisputed that Rule 9(b) applies to Count II—manipulation" under 9 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)); *CFTC v. Shak*, No. 2:22-CV-01258-GMN-NJK, 2023 WL 5717289, at *2–3 (D. Nev. Sept. 5, 2023) (CFTC did not dispute that claims for violation of 7 U.S.C. §§ 6c(a)(5)(C), 9(1), and 17 C.F.R. § 180.1(a) were subject to Rule 9(b)'s heightened pleading standard).

Rule 9(b) "operates as a screen against spurious fraud claims" by "forc[ing] the plaintiff to conduct a careful pretrial investigation" in order to support particularized factual allegations. *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016). In addition, Rule 9(b)'s "purpose is to ensure that the party accused of fraud . . . is given adequate notice of the specific activity that the plaintiff claims constituted the fraud so that the accused party may file an effective responsive pleading." *Lachmund v. ADM Inv. Servs., Inc.*, 191 F.3d 777, 783 (7th Cir. 1999). Under Rule 9(b), the CFTC must "state with *particularity* the circumstances constituting fraud," that is – the "who, what, when, where, and how" of the alleged fraud. *Grenadyor v. SN Servicing Corp.*, No. 21-CV-02980, 2023 WL 2663954, at *2 (N.D. Ill. Mar. 28, 2023) (Kness, J.) (emphasis in original).

In addition, to state a spoofing claim, the CFTC must allege that Logista placed orders with the "intent to cancel" those orders *at the time they were placed*. 7 U.S.C. § 6c(a)(5)(C). "Although states of mind may be pleaded generally, the 'circumstances' must be pleaded in detail." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (quoting Fed. R. Civ. P. 9(b)). A plaintiff must allege scienter with "a sufficient level of factual support," such that there is "a basis for believing that plaintiffs could prove scienter." *In re HealthCare Compare Corp.*

9

*Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996); *Biggers Holdings LLC v. Garcia*, No. 21-CV-4680, 2022 WL 3107617, at *5 (N.D. Ill. Aug. 4, 2022) ("[A] plaintiff must still plead sufficient facts from which a court can reasonably infer that the defendant acted with the requisite state of mind."); *CFTC v. Caniff*, No. 19-CV-2935, 2020 WL 956302, at *7 (N.D. Ill. Feb. 27, 2020) (same); *Bendtrand Glob. Servs. S.A. v. Silvers*, No. 21 C 4684, 2022 WL 3716203, at *3 (N.D. Ill. Aug. 29, 2022) ("[T]he well-pleaded facts must give rise to a plausible inference as to Defendant's state of mind").

## ARGUMENT

### I.  THE CFTC'S SPOOFING AND MANIPULATION CLAIMS (COUNTS I & II) DO NOT SATISFY RULE 9(b) AND FAIL TO ADEQUATELY ALLEGE SCIENTER.

The Amended Complaint does not satisfy Rule 9(b) because it fails to explain how, much less why, Logista's trading activity was manipulative spoofing. The Amended Complaint does not allege any facts that would distinguish Logista's so-called "Large Spoof Orders" from other, legitimate orders. *See Coscia*, 866 F.3d at 796. The CFTC's recognition that Logista placed legitimate "Large *Non*-Spoof Orders" opposite "Genuine Orders" and also canceled certain of its "Large *Non*-Spoof Orders" within three minutes only serves to underscore the CFTC's failure to adequately allege how the "Large Spoof Orders" were illegitimate. Apparently, the only difference between "Large Spoof Orders" opposite "Genuine Orders" canceled within three minutes and "Large *Non*-Spoof Orders" opposite "Genuine Orders" canceled within three minutes is that the "Genuine Orders" were filled or partially filled in the case of "Large Spoof Orders," and were not filled or partially filled in the case of "Large *Non*-Spoof Orders." But how can the fact that "Genuine Orders" were filled or partially filled – which is determined by market forces – have any bearing on Mr. Serotta's intent *at the time he placed a 200+ contract order*?

10

The CFTC does not describe any facts that could justify an inference that Logista intended to cancel the "Large Spoof Orders" at the time they were placed. To the contrary, the fact that Logista's "Large Spoof Orders" were canceled *after up to three minutes* in the fast-moving futures market suggests the exact opposite: that Logista intended for those orders to execute. And the Amended Complaint does not allege why the CFTC believes Logista's "Large Spoof Orders" had an improper impact on the market. Counts I and II should be dismissed.

### A.     Nothing About the So-Called "Large Spoof Orders" Was Different from Other, Legitimate Orders.

#### 1.     There Is Nothing Wrong with 200+ Contract Orders.

Submitting an order for 200+ contracts is perfectly legitimate market activity. The CFTC concedes that Logista placed numerous orders for 200+ contracts that were *not* manipulative, *i.e.*, the "Large *Non*-Spoof Orders." Am. Compl. ¶ 65. Nor does the fact that Logista's "Large Spoof Orders" may have represented the majority of the order volume at a particular price level distinguish those orders from "Large *Non*-Spoof Orders." Nowhere does the Amended Complaint allege that the "Large *Non*-Spoof Orders" were not also the majority of the order volume at the relevant price level (which was most likely the case).

The Amended Complaint also alleges that Logista's "Large Spoof Orders" "tended to be influential in the order book." *Id.* ¶ 58. But every order "tend[s]" to be "influential." *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002) ("[M]arkets are efficient in the sense that they rapidly adjust to all public information"). And the CFTC has not alleged – because it cannot – that Logista's "Large *Non*-Spoof Orders" were not also "influential in the order book."

#### 2.     There Is Nothing Wrong with Resting Orders.

The CFTC alleges that all of the "Large Spoof Orders" were "resting orders" – *i.e.*, an order to buy at a price below, or an order to sell at a price above, the prevailing market price.

But there is nothing wrong with placing a "resting" order for 200+ contracts. Indeed, the Amended Complaint alleges that nearly 60% (59.7%) of Logista's "Large *Non*-Spoof Orders" were also resting orders for 200+ contracts. Am. Compl. ¶ 65 n.3.

3. <u>There Is Nothing Wrong with Placing Orders on Both Sides of the Market in Unequal Quantities.</u>

The CFTC alleges that the "order book imbalance" caused by Logista's orders on both sides of the market in unequal quantities "trick[ed] other market participants into . . . trading at a time, price or quantity they otherwise would not have[.]" *Id.* ¶ 52. But the CME's guidance on its anti-spoofing rule explains that it is perfectly permissible for market participants to have orders outstanding on both sides of the market – and in unequal quantities.[4] CME Group Market Regulation Advisory Notice RA2107-5, at 4 (Aug. 2, 2021) (explaining that market participants are not "prohibit[ed] from making a two-sided market with unequal quantities"). Indeed, the CME guidance describes an order imbalance created by the same trader of "100 bid" on one side of the market and "10 offered" on the other side as legitimate market activity. *Id.* Thus, there was nothing wrong with Logista placing orders on both sides of the market or with an imbalance between order sizes.

In fact, the Amended Complaint alleges that Logista properly placed "Large *Non*-Spoof Orders" opposite "Genuine Orders," including (1) "Large *Non*-Spoof Orders" that were canceled *under* three minutes *if* there were no "Genuine Orders" filled, (2) "Large *Non*-Spoof Orders" that were fully filled under three minutes opposite "Genuine Orders," and (3) "Large *Non*-Spoof Orders" canceled *after* three minutes even if opposing "Genuine Orders" had been filled.

---

[4] https://www.cmegroup.com/rulebook/files/cme-group-Rule-575.pdf. The Court can take judicial notice of the CME's guidance. *Vranjkovic v. Eldorado Trading Grp., LLC*, No. 14 C 6810, 2014 WL 6685960, at *2 (N.D. Ill. Nov. 24, 2014) (considering CME Rulebook on motion to dismiss).

Plainly, placing orders of unequal sizes on both sides of the market is a legitimate trading practice.

### 4. There Is Nothing Wrong with Orders Ending Up Behind Other Orders.

The Amended Complaint emphasizes that Logista's "Large Spoof Orders" ended up behind other orders in the order book, and argues that is evidence of fraudulent intent. Am. Compl. ¶¶ 68, 72, 76, 80. But the CFTC does not allege that Logista intentionally waited to submit orders at a particular price level to make sure that those orders were behind other orders. Nothing in the Amended Complaint suggests that the "Large Spoof Orders" were behind other orders for any reason other than because they were entered after other orders at the same price, or were entered at a price lower than the best bid or higher than the best offer. *Id.* ¶ 47. And the CFTC does not allege – again, because it cannot – that Logista entered resting "Large *Non*-Spoof Orders" any differently than Logista entered resting "Large Spoof Orders" such that they had different placement in the order book. In short, nothing in the Amended Complaint suggests the placement of Logista's alleged "Large Spoof Orders" in the order book was any different from the placement of Logista's other, legitimate orders.

### 5. There Is Nothing Wrong with Canceling Orders.

There is nothing unusual about a market participant canceling an order. *CP Stone Fort Holdings, LLC v. John*, No. 16 C 4991, 2016 WL 5934096, at *6 (N.D. Ill. Oct. 11, 2016) ("[T]here is nothing improper or illegitimate about placing passive [resting] orders in the order book and then reversing position."). Indeed, futures orders are routinely canceled. *Cf.* Gideon Mark, *Spoofing and Layering*, 45 J. Corp. L. 399, 414 (2020) ("[O]rder cancellation is so common that futures exchanges provide numerous order types that presuppose cancellation"); *id.* n.123 ("According to one estimate, more than half of bids or offers placed in futures markets are canceled."); *Coscia*, 866 F.3d at 793 (noting estimate that certain types of traders legitimately

cancel 98% of their orders before execution).

Orders are canceled after they are placed for a variety of entirely legitimate reasons, including based on changes in market conditions. "[T]he futures markets move quickly and react to a steady stream of information external to the order book—a good price at one moment may be a terrible deal just minutes later." *United States v. Vorley*, No. 18 CR 00035, 2021 WL 1057903, at *9 (N.D. Ill. Mar. 18, 2021). According to the Amended Complaint, the "Relevant Period" for Logista's conduct is January to April 2020, Am. Compl. ¶ 1 – the months immediately prior to and during the onset of the COVID-19 Pandemic. During this time, the natural gas and crude oil markets were notoriously volatile, meaning the market conditions were changing rapidly, thus creating more reasons for canceling orders. *See, e.g.*, *In re EP Energy E&P Co., L.P.*, No. 19-35647, 2021 WL 5917771, at *3 n.4 (Bankr. S.D. Tex. Dec. 14, 2021) (describing how "[t]he price of crude oil plummeted in March 2020"); *In re Chesapeake Energy Corp.*, 70 F.4th 273, 277 (5th Cir. 2023) (describing oil and gas drilling company's bankruptcy in light of "ongoing low gas prices compounded by the COVID pandemic's market disruption").

The fact that Logista placed resting orders that did not execute and were therefore canceled is hardly remarkable, and certainly does not establish that Logista placed those orders with the intention of canceling them at the time they were placed.[5] It certainly cannot be the law that simply because an order was canceled after as long as three minutes such cancellation leads to the inference that the trader intended to cancel the order *at the time the order was placed*.

Further, because the CFTC alleges that "Large *Non*-Spoof Orders" had a fill rate of

---

[5] Further, the Complaint provides no market context by which to compare Logista's cancellations of 200+ contract orders – such as cancellation times or rates – to the 200+ contract orders of other market participants. *United States v. Coscia*, 4 F.4th 454, 464 (7th Cir. 2021) ("only 0.57% of Coscia's large orders were on the market for more than one second, whereas 65% of large orders entered by other high-frequency traders were open for more than a second").

29.62%, Am. Compl. ¶ 65, that means around 70% of all contracts in "Large *Non*-Spoof Orders" were canceled. The CFTC recognizes that Logista placed "Large *Non*-Spoof Orders" opposite "Genuine Orders," and canceled those "Large *Non*-Spoof Orders" *after* three minutes when the Genuine Orders were filled or partially filled. *Id.* ¶ 64. But the Amended Complaint never explains why those "Large *Non*-Spoof Orders" opposite "Genuine Orders" that were canceled *after* three minutes were legitimate orders while "Large Spoof Orders" canceled *before* three minutes were spoof orders. To show spoofing, the CFTC must prove Logista intended to cancel an order *at the time the order was placed*. There is no reason to infer that Logista intended to cancel an order *at the time the order was placed* only if the order was canceled within the CFTC's arbitrarily selected three-minute cutoff.

In short, there is nothing wrong with any of the trading activity the CFTC identifies, and the Amended Complaint alleges nothing that distinguishes Logista's trading from other, legitimate trading.

**B. The CFTC's Two Fill Rate Comparisons Do Not Support Manipulation.**

1. The Different Fill Rates of Logista's "Large *Non*-Spoof Orders" and "Large Spoof Orders" Do Not Support Manipulation.

The CFTC's primary support for its allegation that Mr. Serotta intended to cancel orders at the time those orders were entered is a comparison of fill rates of "Large Spoof Orders" (1.42%) to "Large *Non*-Spoof Orders" (29.62%), both of which involve orders of 200+ contracts.[6] *Id.* ¶ 65. But the CFTC's comparison is arbitrary and meaningless because the CFTC defined "Large *Non*-Spoof Orders" in a way that results in those orders having a higher fill rate.

---

[6] The 1.42% fill ratio the CFTC identified for Logista's "Large Spoof Orders" is dramatically higher than the fill ratio for alleged spoof orders in other cases. *Cf. Skudder*, 2022 WL 17752392, at *3 (large "spoof orders were filled just .22 percent of the time"); *United States v. Chanu*, 40 F.4th 528, 534 (7th Cir. 2022) (fill ratio for spoof orders was 0.2%).

The CFTC's definition of "Large *Non*-Spoof Orders" necessarily includes all of Logista's fully filled orders for 200 or more contracts, whereas the "Large Spoof Orders" are defined as resting orders for 200 or more contracts that were canceled within three minutes (even though they may have been partially filled). *Id.* ¶¶ 45, 53. By defining "Large *Non*-Spoof Orders" to include all fully filled orders for 200+ contracts, the CFTC guarantees that "Large *Non*-Spoof Orders" have higher fill rates than "Large Spoof Orders." Thus, the difference in the relative fill rates between "Large *Non*-Spoof Orders" and "Large Spoof Orders" is meaningless.

> 2. The Different Fill Rates of Logista's "Genuine Orders" and "Large Spoof Orders" Do Not Support Manipulation.

The CFTC also compares the number of contracts filled on Logista's "Genuine Orders" and "Large Spoof Orders" as support for its manipulation claim. *Id.* ¶ 66. But this comparison is also meaningless. The CFTC alleges that the "Genuine Orders" consisted largely of "aggressive" orders, meaning, according to the CFTC, they "are guaranteed to execute, at least partially, immediately after being placed," *id.* ¶¶ 45, 53, whereas the "Large Spoof Orders" were all "resting" orders that were "not guaranteed to execute," *id.* ¶¶ 46, 53. As such, it is no surprise that the "Genuine Orders" had higher fill rates – because according to the CFTC, they were "guaranteed to execute."

Moreover, the difference in fill rates between "Large *Non*-Spoof Orders" and "Genuine Orders" is also large. Yet, the CFTC agrees that the "Large *Non*-Spoof Orders" are legitimate orders, despite their very different fill rates from "Genuine Orders." The CFTC alleges that less than 30% of all contracts in Logista's "Large *Non*-Spoof Orders" filled compared to nearly 65% of all contracts in Logista's small non-spoof "Genuine Orders." *Id.* ¶¶ 65–66. The Amended Complaint never explains why those two types of admittedly legitimate orders – large and small

– have such disparate fill rates. Thus, the CFTC's reliance on different fill rates for "Large Spoof Orders" and "Genuine Orders" provides no support for the CFTC's charge of spoofing.

### C. The CFTC Has Not Alleged Any Facts to Support Its Conclusory Assertion That Logista's Orders Had a "Very Low Risk" of Execution.

The CFTC's claim that Logista intended to cancel the "Large Spoof Orders" at the time they were placed hinges entirely on the CFTC's claim that those orders had a "very low risk" of execution. But the CFTC does not allege any facts to support its conclusory assertion that Logista's resting "Large Spoof Orders" actually had a "very low risk of filling." Nor does the CFTC allege that the "risk of filling" was different between resting "Large Spoof Orders" and resting "Large *Non*-Spoof Orders," or that Logista placed "Large Spoof Orders" any differently from how it placed "Large *Non*-Spoof Orders." The risk of the order filling in these fast-moving futures markets would depend on average trading and cancellation volumes, which would impact the likelihood of Logista's order being moved up in the queue for execution.[7] Such market context is essential under Rule 9(b) to support the CFTC's pivotal allegation that Logista intended to cancel orders *at the time those orders were placed* because its "Large Spoof Orders" were "protected" from the risk of execution.

### D. The Fact That So-Called "Large Spoof Orders" Were in the Market for a Median of 52 Seconds and as Long as Up to Three Minutes Undercuts the CFTC's Spoofing Claim.

The CFTC newly alleges that "Large Spoof Orders" were left open in the market for a median duration of 52 seconds whereas the "Large *Non*-Spoof Orders" were left open for a median duration of 3 minutes 8 seconds. Am. Compl. ¶ 65. But given that the CFTC defined

---

[7] The CFTC alleges that "[a]s a general matter, the orders at the back of the queue will be filled only if all of the other orders at the same price level have already been filled." Am. Compl. ¶ 47. That allegation is wrong because orders will also move up in the queue if other orders in the front of the queue are canceled – which happens frequently because orders are routinely canceled. *See* Section I.A.5.

"Large Spoof Orders" as ones that were canceled within three minutes and defined "Large *Non*-Spoof Orders" as including orders that were canceled after three minutes, it is hardly surprising that the two types of "large orders" have different median duration times.

Moreover, the CFTC does not allege that there is anything unusual or improper with leaving an order exposed in the market for 52 seconds – which is over 50 times longer than orders were left open in the *Coscia* case. *Coscia*, 4 F.4th at 461 (each spoof order was canceled within 1 second). Indeed, the length of time the "Large Spoof Orders" were open to the market is inconsistent with an intent to cancel an order at the time the order was placed. Unlike in nearly every spoofing case brought by the CFTC, where the alleged "Spoof Order" is canceled almost immediately after it was placed, here, the CFTC alleges that Logista's "Large Spoof Orders" were left open for a median time of 52 seconds and as long as "up to three minutes" after their entry, Am. Compl. ¶¶ 53, 65, 68 – an "eternity" in commodities futures markets. *CFTC v. Oystacher*, No. 15-CV-9196, 2016 WL 3693429, at *39 (N.D. Ill. July 12, 2016) (testimony that "[o]ne second is an eternity" and that the industry "operate[s] in a microsecond precision, which is a millionth of a second"); *cf. CFTC v. Zhao*, No. 1:18-CV-00620, 2018 WL 11355243, at *6 (N.D. Ill. June 4, 2021) (median cancellation time of 0.737 seconds); *CFTC v. Nav Sarao Futures Ltd. PLC*, No. 15-CV-3398, 2016 WL 8257513, at *8 (N.D. Ill. Nov. 14, 2016) (median cancellation time of less than 1 second); *Oystacher*, 2016 WL 3693429, at *4 (all spoof orders were canceled within 1 second); *CFTC v. Vorley*, No. 18-CV-00603, 2022 WL 1681809, at *3 (N.D. Ill. Apr. 7, 2022) (spoof orders were often canceled within 5 seconds); *CFTC v. Chanu*, No. 18-CV-00603, 2022 WL 1684552, at *3 (N.D. Ill. Apr. 7, 2022) (spoof orders were often canceled within 5 seconds); *Shak*, 2023 WL 5717289, at *7 (median cancellation time of 11.8 seconds); *Skudder*, 2022 WL 17752392, at *3 (median cancellation

time of 10.38 seconds).

In short, the CFTC's allegation that Logista left its so-called "Large Spoof Orders" "open on the market for some time" – up to three minutes and with a median duration of 52 seconds – is flatly inconsistent with the CFTC's claim that Logista intended to cancel those orders at the time those orders were placed.

### E. The Amended Complaint Does Not Allege What Impact the "Large Spoof Orders" Purportedly Had on the Market.

"To plead manipulative conduct, the [CFTC] here must plead . . . what effect the scheme had on the market for the commodities at issue." *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1012 (N.D. Ill. 2015); *cf. Coscia*, 866 F.3d at 787 (spoofing "differs from legitimate trading, however, in that it can be employed to *artificially move* the market price of a stock or commodity up and down, instead of taking advantage of natural market events") (emphasis in original). For example, in *Kraft* the Court found the CFTC had sufficiently alleged the effect the defendant's scheme had on the market where the complaint alleged with particularity the exact price impact defendant's conduct had on the market. 153 F. Supp. 3d at 1005 (alleging that defendant's conduct caused futures prices to increase from $5.75 as of November 28, 2011 to $6.12 as of December 2, 2011, and cash prices to decline from $6.16 as of December 2, 2011 to $5.86 as of December 9, 2011). In contrast here, the Amended Complaint contains no such specificity and instead simply rests on the CFTC's bare assertion that Logista's "false signals of supply and demand allowed [Logista] to execute [its] Genuine Orders in larger quantities and at better prices than [it] otherwise would have absent the Spoof Orders." Am. Compl. ¶ 55. The Amended Complaint does not allege what Logista's fill rate on "Genuine Orders" would have been absent the "Large Spoof Orders" or at what price Logista would have executed "Genuine Orders" absent the "Large Spoof Orders." Again, Logista identified this pleading deficiency in

its original motion to dismiss, but the CFTC did not even attempt to cure that deficiency.

For this additional reason, the CFTC's Amended Complaint fails under Rule 9(b) because it does not allege with particularity what impact the so-called "Large Spoof Orders" had on the market.

### F. The CFTC's Five Examples Are Insufficient to State a Spoofing Claim.

The CFTC's five trade examples – which merely recite the details of five trade sequences – do not cure the CFTC's pleading deficiencies. *See In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 539–40 (S.D.N.Y. 2008) (merely describing the factual details of a trade does not satisfy the heightened pleading obligations of Rule 9(b)). The Amended Complaint's five trade examples do not allege that Logista's "Large Spoof Orders" caused artificial prices in the market or caused other market participants to trade with Logista. In Examples 1, 2, and 3, the CFTC alleges that Logista entered "aggressive" "Genuine Orders," meaning they were "*guaranteed* to execute, at least partially, immediately after being placed." Am. Compl. ¶ 73 ("[m]ost of these smaller orders were aggressively entered"), ¶ 77 ("[a]lmost all of the Genuine Orders were aggressively entered"), ¶ 81 (same). Yet, in those three examples, Logista succeeded in executing only 38%, 34%, and 27%, respectively, of the "Genuine Orders." *Id.* ¶¶ 73, 77, 81. Such low fill rates for orders that, according to the CFTC, "were *guaranteed* to execute" undercut the CFTC's claim that the "Large Spoof Orders" impacted the fill rates for Logista's "Genuine Orders." Moreover, the CFTC never alleges what an expected fill rate would be for orders like the "Genuine Orders," much less how that expected fill rate changed because of the alleged "Large Spoof Orders" in those examples. Without allegations of what a normal fill rate would be for the "Genuine Orders," the CFTC has no basis to contend that absent the "Large Spoof Orders" Logista would not have had similar fill rates on the "Genuine Orders."

The CFTC alleges in Examples 4 and 5 that Logista engaged in a trading pattern whereby it placed an order for 201 or 301 contracts on one side of the market, and then flipped that 201 or 301 contract order to the other side of the market repeatedly. *Id.* ¶¶ 84, 94. Surely, no market participant was tricked by such trading activity – which deception the CFTC claims was central to Logista's alleged spoofing – because it is a reasonable conclusion that the same trader was placing the 201- or 301-contract orders given the unique size characteristics of those orders (one additional contract added to the 200- and 300-contract orders). Logista identified all of these pleading deficiencies with the CFTC's examples in its original motion to dismiss, but the CFTC did not attempt to address those deficiencies.

In short, the CFTC's Counts I and II for spoofing and manipulation should be dismissed.

## II. THE CFTC'S COUNTS III AND IV FOR FAILURE TO SUPERVISE SHOULD BE DISMISSED.

In Counts III and IV, the CFTC alleges that Logista was "able to engage in disruptive trading practices" in violation of Regulation 166.3 and the CFTC's 2017 settlement order with Logista, because Logista "lacked an adequate supervisory structure and compliance program." *Id.* ¶¶ 115–25. However, because the CFTC has not adequately alleged any disruptive trading practices, its failure to supervise claims should be dismissed. *See In re FSI Futures, Inc.*, 2 Comm. Fut. L. Rep. (CCH) ¶ 27,150, at n.90 (C.F.T.C. 1997) (noting that the CFTC has never "impose[d] independent liability under Regulation 166.3" "in the absence of a finding of an underlying violation of the Act or the Commission's regulations").

Moreover, the CFTC's failure to supervise claims rely in part on allegations that Logista failed to properly supervise trading conducted on ICE Europe. Am. Compl. ¶ 92 (noting that "Spoof Event Example 5" – trading on ICE Europe – "constitutes the basis" for the alleged failure to supervise violation). However, the CEA and Regulation 166.3 do not extend

extraterritorially to Logista's trading on ICE Europe. *CFTC v. Garofalo*, No. 10 C 2417, 2010 WL 11245430, at \*6 (N.D. Ill. Dec. 21, 2010) ("[T]he Act [CEA] creates a comprehensive regulatory scheme premised on control over *domestic* futures exchanges and the trading of futures contracts on those [domestic] exchanges.") (emphasis in original); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2016 WL 5108131, at \*26–27 (S.D.N.Y. Sept. 20, 2016) (same); *see also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182 (2d Cir. 2014) (federal securities laws did not apply extraterritorially to "purchases of foreign shares on foreign exchanges," even when those purchases were made in the United States); *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 269 (2010) ("reject[ing] the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad"). Regulation 166.3 for failure to supervise only applies to the "activities . . . relating to [a defendant's] business as a [CFTC] registrant." 17 C.F.R. § 166.3. Because the CEA and Regulation 166.3 do not apply to Logista's trading on ICE Europe, Logista's alleged failure to properly supervise that foreign trading does not relate to Logista's business as a CFTC registrant.

In response to Logista's original motion to dismiss, the CFTC added the irrelevant allegation that Logista "admitted [in the 2017 settlement] the Commission's jurisdiction to bring an enforcement action under Regulation 166.3 for Logista's failure to supervise a former employee" for trading in August 2014. Am. Compl. ¶ 26. But this lawsuit is not an "enforcement action" for Logista's continued failure to supervise that former employee. Regardless, the reach of the CEA cannot be extended to conduct relating to foreign exchanges. Thus, Counts III and IV should also be dismissed to the extent that they are based on allegations that Logista failed to properly supervise trading conducted on ICE Europe.

In addition, Count IV, which alleges that Logista violated the "obey-the-law" provision of the 2017 settlement order, should be dismissed for the independent reason that such "obey-the-law" provisions are unenforceable. *See id.* ¶ 121 (2017 settlement order "required Logista to cease and desist from violating Regulation 166.3"); *SEC v. Graham*, 823 F.3d 1357, 1362 n.2 (11th Cir. 2016) ("Repeatedly we have said that, in the context of SEC enforcement actions and otherwise, 'obey-the-law' injunctions are unenforceable."); *CFTC v. Fintech Inv. Grp., Inc.*, No. 6:20-CV-652-WWB-EJK, 2022 WL 1819152, at *1 (M.D. Fla. Mar. 24, 2022) (rejecting proposed consent order because it did "nothing more than require Defendants to obey the law"). Because Count IV seeks to enforce an "obey-the-law" provision that is unenforceable, Count IV fails to state a claim and should be dismissed for that independent reason.

## CONCLUSION

Because the Amended Complaint fails to cure the pleading deficiencies identified in Defendants' original motion to dismiss, which are uncurable, the Court should grant Logista's motion to dismiss the CFTC's Amended Complaint in its entirety with prejudice. *Baro v. Lake Cnty. Fed'n of Tchrs. Local 504, IFT-AFT/AFL-CIO*, 594 F. Supp. 3d 1012, 1021 (N.D. Ill. March 28, 2022) (Kness, J.) (dismissing amended complaint with prejudice because any further amendment would be futile); *CFTC v. Archegos Cap. Mgmt. LP*, 2023 WL 6123102, at *7 (S.D.N.Y. Sept. 19, 2023) (denying leave to file a second amended complaint because "the CFTC ha[d] not shown that repleading would correct the substantive deficiencies in the complaint").

Date: December 19, 2023                  Respectfully submitted,

**CAULEY LAW GROUP LLC**


By: */s/ Thomas K. Cauley, Jr.*
    Thomas K. Cauley, Jr. (ARDC No. 6185259)
    tom@cauleylawgroup.com
    Cauley Law Group LLC
    521 Morris Lane
    Hinsdale, IL 60521
    (312) 493-8970

    Steven E. Sexton (ARDC No. 6287356)
    ssexton@sidley.com
    Thomas A. Weber (ARDC No. 6336929)
    tweber@sidley.com
    Sidley Austin LLP
    One South Dearborn
    Chicago, Illinois 60603
    (312) 853-7000

    ***Attorneys for Defendants***