# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> LOGISTA ADVISORS LLC and ANDREW HARRIS SEROTTA, <br><br> Defendants. | Case No. —— 23-cv-7485 <br><br> Hon. ———————— John F. Kness <br><br> **JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### I. INTRODUCTION

1.      From at least in or around January 2020 through at least in or around April 2020 (the "Relevant Period"), Logista Advisors LLC ("Logista"), acting through its head trader, principal, and chief executive officer, Andrew Harris Serotta ("Serotta") (together, "Defendants"), engaged in manipulative and deceptive acts and practices in the natural gas futures and crude oil futures markets, while placing orders for and trading futures contracts on a registered entity. By placing hundreds of orders with the intent to cancel them before execution, Defendants intentionally or recklessly sent false signals of increased buying or selling interest designed to trick other market participants into entering higher bids or lower offers, allowing Defendants to execute orders on the opposite side of their order book at advantageous prices.

2.      This was not the first time Logista, a Houston, Texas, energy-trading firm, violated the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 1–26, and Commission Regulations ("Regulations"), 17 C.F.R. pts. 1–190 (2022). On September 29, 2017, the

Commodity Futures Trading Commission ("Commission" or "CFTC") instituted administrative proceedings against Logista, issuing an Order ~~(the "2017 Order")~~ finding that, for several months in 2013 and 2014, Logista gave inadequate training, direction, and supervision to an employee trading crude oil futures. *In re Logista Advisors LLC*, CFTC No. 17-29, 2017 WL 4386949 (Sept. 29, 2017) (the "2017 Order"). These deficiencies resulted in the employee, while trading on a foreign futures exchange, repeatedly engaging in the disruptive trading practice commonly known as "spoofing," *i.e.*, bidding or offering with the intent to cancel his bid or offer before execution. The Commission further found that after the exchange's compliance department detected the trader's misconduct, Logista failed to satisfy its obligation to supervise an appropriate investigation that would enable Logista to provide accurate responses to the exchange's inquiries. Among other things, the 2017 Order required Logista to cease and desist from failing to diligently supervise the handling by its employees and officers of commodity interest accounts and other activities relating to Logista's business as a Commission registrant, in violation of Regulation 166.3, 17 C.F.R. § 166.3 (2022).

3. During the Relevant Period, Defendants wrongfully obtained gains from the scheme involving spoofing and deceptive trading of hundreds of thousands of dollars, to the detriment of counterparties and other market participants.

4. Through this conduct, Defendants have engaged, are engaging, or are about to engage in fraudulent and manipulative acts and practices in violation of the Act and Regulations—specifically, Sections 4c(a)(5)(C) and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(a)(5)(C), 9(1), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2022).

5. Logista also failed to provide supervision adequate to prevent Serotta from engaging in spoofing and manipulative and deceptive trading practices. Through this conduct,

Defendants have engaged, are engaging, or are about to engage in violations of Regulation 166.3, 17 C.F.R. § 166.3 (2022), and the 2017 Order's injunction against further supervision failures.

6.      The acts and omissions described herein were all done during the Relevant Period by Serotta or other officers, employees or agents of Logista in the scope of their employment or office at Logista. Therefore, Logista is liable for all acts and omissions described herein, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022).

7.      Serotta was a controlling person of Logista throughout the Relevant Period and either did not act in good faith or knowingly induced Logista's violations of Sections 4c(a)(5)(C) and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(a)(5)(C), 9(1), and Regulations 166.3 and 180.1, 17 C.F.R. §§ 166.3, 180.1 (2022). Therefore, Serotta is liable for Logista's violations of those provisions of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

8.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to enjoin such acts and practices and compel compliance with the Act. In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, pre-and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

9.      Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.      **JURISDICTION AND VENUE**

10.      **Jurisdiction**. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction

over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive and other relief against any person whenever it appears to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

11. **Venue**. Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants transact business in this District, or because acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District.

### III.    THE PARTIES

12.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and the Regulations. The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W. Washington, D.C. 20581.

13.    Defendant **Logista Advisors LLC** is a Delaware limited liability company, with its place of business in Houston, Texas. Logista is an energy trading firm that manages a commodity pool. Logista has been registered with the Commission as a Commodity Trading Advisor and Commodity Pool Operator since December 12, 2012, and was also registered with the National Futures Association ("NFA") as a Swap Firm from August 4, 2014, until January 1, 2020.

14.    Defendant **Andrew Harris Serotta** is an individual who resides in Houston, Texas. Serotta is the owner, founder, and Chief Executive Officer of Logista, and serves as

Logista's head trader. Serotta has been registered with the Commission as an Associated Person of Logista since December 12, 2012, and has been listed with NFA as a principal of Logista since November 7, 2012. He was registered with NFA as a Swap Associated Person of Logista from August 4, 2014, until December 2, 2019.

## IV.  OTHER RELEVANT ENTITIES

15.  **New York Mercantile Exchange** ("NYMEX") is a commodity exchange registered with the CFTC as a designated contract market under Section 5 of the Act, 7 U.S.C. § 7, and defined as a "registered entity" under Section 1a of the Act, 7 U.S.C. § 1a(40). Among other things, NYMEX lists for trading natural gas futures, crude oil futures, and other energy contracts. NYMEX's headquarters is located in New York, New York.

16.  **CME Group Inc.** ("CME") is a Delaware corporation with its principal place of business in Chicago, Illinois, and the parent company of NYMEX. CME operates an electronic trading platform known as Globex, which is located in Aurora, Illinois. Globex is an open-access marketplace that allows market participants ("traders") to view the aggregated book of visible orders and prices for futures contracts and enter their own orders to buy or sell futures contracts. Through pre-defined sets of trade matching rules, Globex enables the execution of buy orders opposite sell orders for specific quantities at specific prices.

17.  **ICE Futures Europe** ("IFEU") is a commodity exchange based in the United Kingdom, subject to regulatory supervision by the U.K. Financial Conduct Authority. IFEU is registered as a foreign board of trade pursuant to Section 4(b)(1) of the Act, 7 U.S.C. § 6(b)(1) and Part 48 of the Regulations, and is subject to supervision by the CFTC on that basis.

## V.  LEGAL BACKGROUND

### A.  Spoofing

18.     Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C), provides that "[i]t shall be unlawful for any person to engage in trading, practice, or conduct on or subject to the rules of a registered entity that . . . is, is of the character of, or is commonly known to the trade as, 'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution)."

**B.     Manipulative or Deceptive Devices**

19.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), provides that "[i]t shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate."

20.     Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2022), provides that "[i]t shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) [u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; . . . [or] (3) [e]ngage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person."

**C.     Failure to Supervise**

21.     Regulation 166.3, 17 C.F.R. § 166.3 (2022), provides that "[e]ach Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) of all commodity interest accounts carried, operated,

advised or introduced by the registrant and all other activities of its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) relating to its business as a Commission registrant."

### D. Violation of Commission ~~Orders~~**Order**

22. Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that "[w]henever it shall appear to the Commission that any registered entity or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, . . . the Commission may bring an action in the proper district court of the United States . . . to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder."

### E. Derivative Liability

23. Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022), provide that "[t]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person."

24. Section 13(b) of the Act, 7 U.S.C. § 13c(b), states in relevant part:

> Any person who, directly or indirectly, controls any person who has violated any provision of this Act or any of the rules, regulations, or orders issued pursuant to this Act may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

## VI. <u>FACTS</u>

### A. The 2017 Order and Subsequent Events

25.     In the 2017 Order, the Commission determined that Logista had provided inadequate training, direction, and supervision to an employee for a period of months during 2013 and 2014.[1] The Commission found that, as a result of these failures, the employee engaged in numerous instances of spoofing while trading a crude oil futures spread contract on IFEU. Logista consented to the use of the findings and conclusions in the Order in any other proceeding brought by the Commission, and further agreed that the findings and conclusions "shall be taken as true and correct and be given preclusive effect therein, without further proof." 2017 Order at *1 n.1.

26.     Although Logista consented to the entry of the 2017 Order "[w]ithout admitting or denying the findings or conclusions herein," it specifically admitted the Commission's jurisdiction to bring an enforcement action under Regulation 166.3 for Logista's failure to supervise a former employee who, "in his trading on a foreign futures exchange, repeatedly engag[ed] in the disruptive trading practice commonly known as 'spoofing'."[1]

2627.     According to the 2017 Order, Logista lacked procedures for the detection or deterrence of such trading; provided no training regarding disruptive trading to the employee in question; and had no written policies or procedures on the subject of disruptive trading.

2728.     The 2017 Order required Logista to pay a civil monetary penalty of $250,000 and to cease and desist from failing to diligently supervise the handling by its employees and officers of commodity interest accounts and other activities relating to Logista's business as a Commission registrant, in violation of Regulation 166.3, 17 C.F.R. § 166.3 (2022).

---

[1] Logista consented to the entry of the 2017 Order "[w]ithout admitting or denying the findings or conclusions [t]herein."

[1] 2017 Order at *1; *see also id.* at *5 ("Logista . . . [a]dmits the jurisdiction of the Commission with respect to this Order only *and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order . . .*" (emphasis added)).

2829.   Notwithstanding the requirements of the 2017 Order, Logista failed to take adequate steps in order to discharge its supervisory obligations for at least three years. For example, although Logista developed policies and procedures regarding disruptive trading following the 2017 Order, it failed to prevent Logista's CEO and head trader from engaging in spoofing on both CME and IFEU, as alleged herein.

2930.   In addition, it took Logista until 2020 to implement annual compliance presentations and to require quarterly affidavits attesting to the fact that traders had not engaged in disruptive trading. Logista also did notin or about the second half of 2020 to hire additional compliance personnel until 2021 and did notor invest in software to monitor for disruptive trading until 2022. Upon information and belief, Logista took these steps only after it received a document preservation notice from the CFTC regarding the alleged misconduct during the Relevant Period. Therefore, Logista's supervisory system was generally inadequate, and it also failed to perform its supervisory duties diligently.

### B.    Overview of Natural Gas and Crude Oil Futures Markets and Trading

3031.   A futures contract is an agreement to buy or sell a commodity for delivery or cash settlement in the future at a specified price.

3132.   A futures contract traded on an exchange has standard, non-negotiable contract specifications, such as the quality, quantity, and physical delivery time and location for the given product. Futures contracts are used to assume or shift price risk, and may be satisfied by cash settlement, physical delivery, or offset.

3233.   The Henry Hub natural gas futures contract listed on NYMEX ("NG" contract) is regularly traded on Globex. The standard contract unit for a NG contract (one "lot," in trading

terminology) equals 10,000 million British thermal units ("mmBtu") and is traded for delivery on a monthly basis throughout each year.

33 34. The price of the NG contract is quoted in dollars per mmBtu, and the minimum price change allowed during a trading session is $.001 per mmBtu. This minimum price change is commonly called a "tick," and the movement in price of one "tick" results in a change in the value of the contract by $10 ($0.001 x 10,000 mmBtu). Thus, if a trader wished to place an order above the last traded NG contract price of 4.611 dollars per mmBtu, that trader would have to place the order at 4.612 dollars per mmBtu or higher.

34 35. The West Texas Intermediate crude oil futures contract listed on NYMEX ("CL" contract) is regularly traded on Globex. One lot of a CL contract equals 1,000 barrels and is traded for delivery monthly during the current calendar year, the next 10 calendar years, and two additional months.

35 36. The price of the CL contract is quoted in dollars per 1,000 barrels, in ticks of $.01. The movement in price of one "tick" results in a change in the value of the contract by $10 ($0.01 x 1,000 barrels).

36 37. The Brent Last Day Financial Futures contract listed on NYMEX ("BZ" contract) is regularly traded on Globex. One lot of a BZ contract equals 1,000 barrels and is traded for delivery monthly during the current calendar year, the next seven calendar years, and three additional months.

37 38. The price of the BZ contract is quoted in dollars per 1,000 barrels, in ticks of $.01. The movement in price of one "tick" results in a change in the value of the contract by $10 ($0.01 x 1,000 barrels).

3839.   For contracts such as NG, CL, and BZ, "calendar spreads" are also regularly traded on Globex. In the context of futures contracts, trading calendar spreads involves buying a futures contract for a commodity that expires in a certain month and selling a futures contract for the same commodity that expires in a different month.

3940.   Calendar spreads are priced in terms of the price differential between the two relevant contracts.

4041.   The Globex electronic trading platform allows market participants to trade futures, including NG, CL, and BZ futures contracts listed on NYMEX, between 5:00 PM Central Time on Sunday evening and 4:00 PM Central Time on Friday afternoon.[2] Globex employs a matching algorithm to match bids and offers for execution.

4142.   An "order," in the context of electronic exchange trading, is a request submitted to an exchange to buy (that is, "bid") or sell (that is, "offer" or "ask") a certain number of specified futures contracts. An order may be for a quantity of one or more contracts, or "lots."

4243.   A trader's order is "filled" or "executed" when it is matched on Globex with an "opposite" order (an order to buy, if the trader is selling; or vice versa) for the same price specified by the trader or a price more favorable to the trader. When there exists both a willing buyer and seller for a contract at a given price, a transaction occurs and is referred to as a "fill" (or a "trade" or "execution"). An order is executed in full when there is a willing buyer or seller for all of the contracts the trader is seeking to buy or sell at the trader's specified price or a price more favorable to the trader. An order is executed in part when there is a willing buyer or seller for only some of the contracts the trader is seeking to buy or sell at the trader's specified or a more favorable price. At any time before the order is fully filled, the trader can "cancel" the

---

[2] All times described in this Complaint refer to Central Time, unless otherwise stated.

order. When an order is canceled, the contracts that have not yet been bought or sold are pulled from the order book.

4344.   When a bid or offer is submitted through Globex, it becomes part of the list of orders reflected in the "order book" for a particular futures contract. Traders often consider information in the order book when making trading decisions. Each trader can view the aggregate number of contracts and orders that all traders are actively bidding or offering at a given price level. Only the total numbers of orders and contracts at various price levels are visible; the identities of the traders who placed the orders are not visible. The best-bid level, or first-bid level, is the highest price at which someone is willing to buy. The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell. The bid-ask spread is the difference between those two prices.

4445.   An "aggressive" order is an order that crosses the bid-ask spread. On the buy side of the market, an aggressive buy order is placed at the best-ask price or higher. Put simply, it is an offer to buy at a price at which another trader is currently willing to sell. On the sell side of the market, an aggressive sell order is placed at the best-bid price or lower. Put simply, it is an offer to sell at a price at which another trader is currently willing to buy. Accordingly, aggressive orders are guaranteed to execute, at least partially, immediately after being placed.

4546.   A "passive" or "resting" order, on the other hand, does not cross the bid-ask spread. On the buy side of the market, a passive buy order is placed at the best-bid price or lower; therefore, it is an offer to buy at a price that is lower than the price at which other traders are currently willing to sell. On the sell side of the market, a passive sell order is placed at the best-ask price or higher; therefore, it is an offer to sell at a price that is higher than the price at which other traders are currently willing to buy. Passive orders rest for at least some amount of

12

time after being placed and are not guaranteed to execute. Passive orders may be partially or entirely filled.

46/47. CME employs a matching algorithm to match bids and offers for execution in a given market on Globex. In certain markets, like the energy futures markets on NYMEX at issue here, the matching algorithm applies a First-In-First-Out priority-in-time method to orders entered at the same price level of the order book. The first orders placed at a price level are the first to be executed. As a general matter, if there are multiple buy (or sell) orders at a price level, the buy (or sell) orders will be filled in the sequence in which they were placed. Orders first-in-line to be filled at a given price level are said to be at the "front of the queue," and orders last-to-be-filled are said to be at the "back of the queue." As a general matter, the orders at the back of the queue will be filled only if all of the other orders at the same price level have already been filled.

47/48. As a result, orders at the middle or back of the queue tend to be less likely to be filled than those in the front, and orders at the next-best price level tend to be less likely to be filled than those at the best-price level.

### C. Spoofing Violations in Futures Markets

48/49. All else being equal, in futures markets—including the natural gas and crude oil futures markets—prices will generally rise when there is more interest in buying a particular contract (*i.e.*, the demand side) than there is in selling (*i.e.*, the supply side); conversely, prices will generally fall when supply exceeds demand (*i.e.*, there is more interest in selling than buying).

49/50. Many market participants incorporate supply and demand concepts into their trading decisions, relying on the number of bids and offers at various price levels in the visible

order book to determine whether there is generally more interest to buy or to sell in the market at any given time, and thus whether a corresponding price change is likely. Market participants consider, for example, liquidity and market depth—*i.e.*, the volume of lots and orders that make up bids and offers in the visible order book, in total and at each price level of the order book. Market participants also consider "order book balance" or "order book pressure"—*i.e.*, the ratio of lots and orders on the bid side of the market (or interest to buy) to the lots and orders on the offer side of the market (or interest to sell), in the visible order book, in total and at each price level of the order book.

50 51. For instance, if the total number of lots or orders on the bid (buy) side significantly outweighs the total number of lots or orders on the offer (sell) side, market participants may reasonably believe that there is more interest to buy than to sell. The market participants might thus infer that a price increase is likely. These market participants may then trade accordingly, and some may attempt to buy lots in light of the expected price increase. In such a case, these market participants would place orders to buy at the best-bid level or better, making execution of sell orders at those prices more likely.

51 52. Spoofing (bidding or offering with the intent to cancel the bid or offer before execution) and manipulative or deceptive trading strategies that incorporate spoofing seek to take advantage of these market fundamentals and market participants' reactions to them. This might be done, for example, by placing one or more relatively large spoof orders, or a series of spoof orders, on the buy side, which the trader intends to cancel before execution. In this example, the trader would place these spoof buy orders so as to create an order book imbalance that would convey a false appearance that there is more interest to buy than to sell in the market, and thus trick other market participants into believing that a corresponding price increase is likely. The

trader would employ this strategy with the intent to manipulate market prices and deceive other market participants into trading at a time, price, or quantity they otherwise would not have, in a way that benefits the trader.

**D.    Defendants' Manipulative and Deceptive Scheme**

~~52~~53.    During the Relevant Period, while acting on behalf of Logista, Serotta engaged in a manipulative and deceptive scheme accomplished by means of trading in futures markets such as NG, CL, and BZ. The scheme generally followed a pattern: (1) placement of one or more large resting orders (*i.e.*, of 200 contracts or more) on one side of the market, which he intended to cancel ("Spoof Orders"); (2) placing one or more smaller orders (aggressive, resting, or both) on the opposite side of the market overlapping in time with the Spoof Order, which he intended to execute ("Genuine Orders"); (3) executing (*i.e.*, obtaining fills for) some Genuine Orders; and (4) canceling the Spoof Orders shortly thereafter (*i.e.*, within three minutes of their entry). Each instance of this pattern comprises a single "Spoof Event." Collectively, "Genuine Orders" and "Spoof Orders" are referred to as "Spoof Event Orders."

~~53~~54.    Serotta intended his spoofing activity to put pressure on the price in the direction of his Genuine Orders and to deceive or trick market participants into filling his Genuine Orders at his desired price. Serotta often submitted Genuine Orders to fill immediately, thus retaining the imbalance on the order book created by his large Spoof Orders.

~~54~~55.    Serotta's scheme was designed to benefit Defendants financially from market participants' reactions to his Spoof Orders. By entering orders that he intended to cancel, Serotta deceived other traders about supply and demand, misleading market participants about the likely direction of the commodity's price. Serotta's false signals of supply and demand allowed Serotta

15

to execute his Genuine Orders in larger quantities and at better prices than he otherwise would have absent the Spoof Orders.

~~55~~56.  During the Relevant Period, Serotta engaged in approximately 361 Spoof Events, using approximately 4,558 Genuine Orders and approximately 371 Spoof Orders. Serotta's trading resulted in executions on at least approximately 44,616 futures contracts in his Genuine Orders.

~~56~~57.  Serotta's Spoof Orders generally represented a significant proportion of the overall number of lots then being bid or offered at that price level. On average, Serotta's Spoof Orders constituted more than 80% of the lots on the order book at the price level at which the Spoof Order was entered. Put differently, Serotta's Spoof Orders effected a median increase of nearly 600% in the number of lots on the order book at the relevant price level.

~~57~~58.  These Spoof Orders thus tended to be influential in the order book.

~~58~~59.  As part of this scheme, Serotta canceled over 98.5% of all of the contracts comprising the Spoof Orders he placed according to the pattern described, for a total of more than 123,000 canceled contracts.

~~59~~60.  By engaging in this scheme, Serotta entered Spoof Orders either intentionally to send a false signal to the market that he actually wanted to buy or sell the number of contracts specified in the Spoof Orders, or while recklessly disregarding the fact that entering his Spoof Orders would send such a false signal to other market participants—a signal that injected false information about supply and demand into the market that could affect market activity.

~~60~~61.  Serotta knew that his Spoof Orders would appear in the order book and that traders often consider order-book information in making trading decisions. The risk that the Spoof Orders could mislead other market participants into believing there was genuine interest in

16

purchasing or selling the specified number of contracts represented by Serotta's Spoof Orders was so obvious that Serotta must have been aware of it.

6162.   Serotta engaged in the scheme to trick other market participants into executing against his Genuine Orders, or into submitting resting orders that Serotta could execute his Genuine Orders against, on the opposite side of the market.

6263.   In addition, Serotta knew that Logista had engaged in illegal spoofing activity before, as found in the 2017 Order entered against Logista. Serotta therefore understood that, while potentially profitable, spoofing activity is prohibited by the Act and the Regulations.

6364.   Although Serotta's Spoof Orders were visible to the rest of the market, his identity as the originator of those orders was not. Only the total numbers of orders and contracts at various price levels were visible, not the number of traders or identities of the traders who placed the orders. Accordingly, Serotta knew that other market participants could not see that the same trader had placed both the Spoof Orders and the Genuine Orders, which might have tipped off market participants that Serotta intended to cancel his Spoof Orders.

6465.   Serotta's intent to cancel his Spoof Orders is further demonstrated by his execution rates of similarly-sizedsimilarly sized orders that were *not* part of Spoof Events. As shown in the chart below, during the Relevant Period, Serotta's large orders were filled over twenty times more often when not part of a Spoof Event. Serotta's Spoof Orders also differed from similarly sized orders that were not part of Spoof Events in that the median duration that Spoof Orders were open was shorter than the median duration of large orders that were not part of Spoof Events.

| Comparison of Large Order Fill Ratios (Orders of 200 or Greater Contracts) | | |
|---|---|---|
| | Percentage of Contracts Filled (approximate) | Median Duration of Order |
| Spoof Orders | 1.42% | 52 seconds |
| Large, Non-Spoof-Event Orders[3] | 29.62% | 188 seconds |

6566.  Likewise, *within* Spoof Events, Serotta's ability to avoid executions of his Spoof Orders is striking when comparing his Genuine Orders to his Spoof Orders. Here, the stark contrast in fill ratios results from Serotta's intent to cancel the Spoof Orders. As detailed in the following chart, during the Relevant Period, Serotta was able to obtain executions at a much higher rate for his Genuine Orders than for his Spoof Orders during Spoof Events:

| Contracts Filled in Spoof Events | | | | |
|---|---|---|---|---|
| | Total Number of Orders in Spoof Events | Total Number of Contracts in Orders | Total Number of Contracts Filled | Percentage of Contracts Filled (approximate) |
| Spoof Orders | 371 | 125,478 | 1,786 | 1.42% |
| Genuine Orders | 4,558 | 68,729 | 44,616 | 64.92% |

---

[3] "Large, Non-Spoof-Event Orders" are orders of 200 contracts or more for which at least one of the conditions of a Spoof Event Order, as defined in Paragraph 53, is not satisfied. In other words, an order of 200 contracts or more would be a Large, Non-Spoof-Event Order if it was entered aggressively (i.e., did not rest on the order book), did not overlap in time with at least one opposite-side order that filled, or rested for more than three minutes.

For example, 40.3% of Large, Non-Spoof-Event Orders were entered aggressively and therefore do not qualify as Spoof Orders, as alleged in this Amended Complaint.

6667.   In fact, Serotta canceled more than 94% of his Spoof Orders *in their entirety*, without a single contract filling. By contrast, Serotta fully canceled only 18% of his Genuine Orders.

6768.   Serotta was able to leave the Spoof Orders open for up to three minutes because he knew that there were numerous orders ahead of him (at his order's price level or better). The existence of these orders already on the market ensured that Serotta's Spoof Order was at a very low risk of filling, even if he left the Spoof Order open on the market for some time.

6869.   The conduct involved trades on futures exchanges in the United States, with persons located in the United States and beyond, including in this District.

### E.    Examples of Defendants' Spoof Events

6970.   Serotta's scheme is illustrated by the Spoof Events set forth below.

*Spoof Event Example 1: January 29, 2020*

7071.   As detailed below, Serotta's trading activity on January 29, 2020, constitutes a Spoof Event.

7172.   **The Spoof Order.** On January 29, 2020, at 12:00:06.610 PM Central Time (denoted in hours, minutes, seconds, and milliseconds), Serotta placed an order to sell 301 contracts of the CLM0–CLU0 (crude oil June–September 2020) calendar spread at a differential price of 85 cents per barrel. By comparison, the average order size then at that price level was approximately 6 lots, far smaller than Serotta's Spoof Order. Serotta's Spoof Order constituted 51% of the orders at that price level, meaning that his offer more than doubled the number of lots on the order book at that price level. Serotta placed this Spoof Order at the second-best offer price level, and it was the 50th order in the order queue for that price level. There was also one

lot resting at the best-offer price level.[34] In this way, Serotta's Spoof Order was protected from execution by the volume resting at the best offer and the 49 orders already resting at the second-best price level.

72~~73~~. **The Genuine Orders.** Less than 1.5 seconds later, at 12:00:08.033 PM, Serotta began placing a series of orders to buy CLM0–CLU0 (crude oil June–September 2020) contracts at a differential price of 84 cents per barrel. Most of these smaller orders were aggressively entered, in that they partially or completely filled immediately, like a market order, and crossed the bid-ask spread. Virtually all of the Genuine Orders that Serotta executed—a total of 73 contracts—were filled against orders that had been placed shortly after the Spoof Order. Any remaining volume that did not fill immediately was canceled within 1.5 seconds. Serotta succeeded in filling 77 contracts of his Genuine Orders, out of a total of 201 contracts involved in the Genuine Orders, at a differential of 84 cents per barrel.

73~~74~~. **Canceling the Spoof Order.** At 12:00:23.225 PM, about three seconds after canceling his last unfilled Genuine Order, Serotta canceled the Spoof Order. The Spoof Order received zero fills and was completely canceled.

### *Spoof Event Example 2: February 20, 2020*

74~~75~~. As detailed below, Serotta's trading activity on February 20, 2020, constitutes a Spoof Event.

75~~76~~. **The Spoof Order.** On February 20, 2020, at 1:06:29.086 PM, Serotta placed an order to buy 301 contracts of the NGH0–NGJ0 (natural gas March–April 2020) calendar spread at a differential price of -11 ticks (*i.e.*, -11 tenths of a cent per mmBtu, or -$0.011). By

---

[34] At almost the exact same time that Serotta entered his Spoof Order, another market participant entered a three-lot offer at the best price level.

comparison, the average order size then at that price level was less than 3 lots, far smaller than the 301-lot size of the Spoof Order. Serotta's Spoof Order constituted almost 90% of the order volume at that price level. Put differently, the large Spoof Order increased the resting volume at the price level by approximately 860%. Serotta's Spoof Order was placed at the best-bid price level but was the 14th order in the queue. In this way, Serotta's Spoof Order was protected from execution by the 13 orders already resting at that price level.

7677.   **The Genuine Orders.** Shortly thereafter, at 1:06:39.339 PM, Serotta began placing a series of Genuine Orders to sell NGH0–NGJ0 (natural gas March–April 2020) calendar spread contracts at a differential price of -10 ticks (*i.e.*, -10 tenths of a cent per mmBtu, or -$0.010). Almost all of the Genuine Orders were aggressively entered, in that they partially or completely filled immediately, like a market order, and crossed the bid-ask spread. All of the Genuine Orders executed against orders that had been placed shortly after the Spoof Order. Almost all of the aggressively entered orders that did not fill immediately were canceled within 1.5 seconds. Serotta also placed four Genuine Orders that he allowed to rest for no more than 3 seconds, but that did not fill. In total, Serotta succeeded in filling 269 contracts from 16 Genuine Orders of 49 lots each at a differential of -10 ticks (*i.e.*, -10 tenths of a cent per mmBtu, or -$0.010).

7778.   **Canceling the Spoof Order.** At 1:07:36.935 PM, Serotta canceled the Spoof Order. The Spoof Order received zero fills and was completely canceled less than 5 seconds after the last unfilled Genuine Order was canceled.

### *Spoof Event Example 3: March 11, 2020*

7879.   As detailed below, Serotta's trading activity on March 11, 2020, constitutes a Spoof Event.

79~~80~~.   **The Spoof Order.** On March 11, 2020, at 11:29:48.415 AM, Serotta placed an order to buy 301 contracts of the CLM0–CLZ0 (crude oil June–December 2020) calendar spread at a differential price of -352 cents per barrel. By comparison, the average order size then at that price level was less than 4 lots, far smaller than the 301-lot size of the Spoof Order. Serotta's Spoof Order constituted almost 80% of the orders at that price level. Put differently, his large Spoof Order increased the resting volume at this price level by 390%. Serotta's Spoof Order was placed at the second-best bid price level and was the 21st order in the queue at that price level; there were also 93 lots resting at the best-bid price level (-351 cents).[45] In this way, Serotta's Spoof Order was protected from execution by any volume resting at the best bid and the 20 orders already resting at the second-best price level.

80~~81~~.   **The Genuine Orders.** Shortly thereafter, starting at 11:29:54.745 AM, Serotta placed a series of Genuine Orders to sell CLM0–CLZ0 (crude oil June–December 2020) calendar spread contracts at -349 and -348 cents per barrel. Serotta entered three consecutive 25-lot Genuine Orders that he allowed to rest for 1.5 seconds or less each, but was unable to get a fill. Approximately four seconds later, Serotta aggressed into new buy orders, at a price more favorable to him than had been available before his Spoof Order, that had joined the best bid shortly after the Spoof Order. After canceling the remaining (unfilled) volume from his aggressive Genuine Order approximately one second later, Serotta entered the final Genuine Order for 25 lots that partially filled almost instantly and the remainder about 1 second later. In all, Serotta succeeded in filling 9 contracts at -349 cents per barrel and 25 contracts at -348 cents per barrel, out of a total of 125 contracts across the Genuine Orders he placed.

---

[45] At the time Serotta entered his Spoof Order, there were no orders resting at -350.

81 82. **Canceling the Spoof Order.** At 11:30:50.876 AM, approximately 1 second after Serotta obtained his last Genuine Order fill, he canceled the Spoof Order. The Spoof Order received zero fills and was completely canceled.

### *Spoof Event Example 4: February 19, 2020*

82 83. As detailed below, Serotta's trading activity on February 19, 2020, constitutes multiple Spoof Events. Over the course of approximately sixteen minutes—from 10:56:22.803 PM until 11:12:21.768 PM—Serotta engaged in the following sequence twelve times trading the NGH0–NGJ0 (natural gas March–April 2020) calendar spread: (1) placed an order of 301 lots (a Spoof Order); (2) executed (*i.e.*, obtained fills on) smaller orders on the opposite side of the market (Genuine Orders); (3) canceled his 301-lot order, without having obtained any fills; and (4) placed a new 301-lot order on the opposite side of the market from the prior 301-lot order (a new Spoof Order).

83 84. In two additional instances during this period of time, Serotta canceled a 301-lot order and then placed a new 301-lot order on the same side of the market. Serotta likewise executed small orders on the opposite side of these two 301-lot orders before canceling the 301-lot orders in their entirety.

84 85. In other words, Serotta placed fourteen 301-lot orders in sixteen minutes, repeatedly flipping back and forth between long and short orders of 301 lots (the Spoof Orders). On the opposite side of the 301-lot orders, he placed—and succeeded in filling—numerous smaller orders (the Genuine Orders).

85 86.   Serotta's position and trading in the spread during this period of time is reflected in the following charts. The top panel displays Serotta's position in the spread over time. The second panel sets forth Serotta's resting order volume on both sides of the market over time.[56]



86 87.   At the end of the sixteen-minute sequence, Serotta had not been filled on *any* of the 301-lot orders (a total of 4,214 lots); however, he had executed trades on the smaller, opposite-side orders totaling 2,874 lots. Indeed, though Serotta was filled on 0% of the contracts

---

[56] The darkened portions are comprised of single lines that reflect Genuine Orders that were entered aggressively and therefore filled immediately.

in the Spoof Orders, he was filled on more than 80% of the contracts in the Genuine Orders he placed during this sixteen-minute period.

8788.    Serotta's Spoof Orders during this sequence were open for an average of 44.3a median of 33.2 seconds before Serotta canceled them.

8889.    After sixteen minutes, Serotta's net position in the spread was essentially unchanged; specifically, he was short six lots compared to his opening position.

8990.    Serotta did not make any other trades during this time period on any NG calendar spread on CME.

9091.    Despite the minimal change in his position, Serotta's trading during this sixteen-minute period netted approximately $26,000.

### *Spoof Event Example 5: February 5, 2020*

9192.    As detailed below, Serotta's spoofing on IFEU on February 5, 2020, constitutes the basis for a violation of Regulation 166.3 and of the 2017 Order.

9293.    Over the course of an approximately eighteen-minute period—from about 8:23–8:41 PM GMT on February 5, 2020—Serotta engaged in the following sequence 19 times while trading the ICE Brent/WTI Crude Spread –April 2020: (1) placed an order of 201 to 301 lots (a Spoof Order); (2) executed (*i.e.*, obtained fills on) smaller orders on the opposite side of the market (Genuine Orders); (3) canceled his large order, without having obtained any fills; and (4) placed a new large order on the opposite side of the market from the prior large order (a new Spoof Order).

9394.    In other words, Serotta placed 19 large orders[67] in eighteen minutes, repeatedly flipping back and forth between long and short positions of between 201 and 301 lots (the Spoof

---

[67] Serotta placed one additional order of 301 lots but canceled it immediately and reentered it at a different price.

Orders). On the opposite side of the 301-lot positions, he placed—and succeeded in filling—numerous smaller orders (the Genuine Orders).

95.     Serotta's Spoof Orders during this sequence were open for a median of 36.9 seconds before Serotta canceled them.

9496.   At the end of the eighteen-minute sequence, Serotta had not been filled on *any* of the large orders (a total of 5,919 lots); however, he had executed trades on the smaller, opposite-side orders totaling approximately 2,513 lots. Indeed, though Serotta was filled on 0% of the contracts in the Spoof Orders, he was filled on more than 73% of the contracts in the Genuine Orders he placed during this eighteen-minute period.

9597.   Serotta's trading during this eighteen-minute period netted approximately $25,000.

### F.     Notice of Investigation

9698.   The Commission issued a document preservation notice to Defendants on April 2, 2020, relating to Logista's trading in crude oil derivative contracts. Serotta acknowledged that he changed his trading patterns following receipt of this notice.

## VII.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### Count I—Spoofing
### Violation of Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C)

9799.   Paragraphs 1 through 9698 are re-alleged and incorporated herein by reference.

98100. By reason of the conduct described above, including in Spoof Event Examples 1–4, Serotta engaged in trading, practices, or conduct on or subject to the rules of a registered entity that is, is of the character of, or is commonly known to the trade as, "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution).

~~99~~101. In placing each Spoof Order, Serotta acted with the intent to cancel the bid or offer before execution.

~~100~~102.      By reason of the foregoing, Serotta violated Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C).

~~101~~103.      Serotta engaged in the acts, practices, or conduct described above while acting within the scope of his agency, employment, and office at Logista. Accordingly, Logista is liable pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022), as a principal for Serotta's acts, omissions, or failures in violation of 7 U.S.C. § 6c(a)(5)(C).

~~102~~104.      At all times relevant to this Complaint, Serotta controlled Logista, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Logista's conduct alleged in this Count; therefore, pursuant to 7 U.S.C. § 13c(b), Serotta is liable for Logista's violations of 7 U.S.C. § 6c(a)(5)(C).

~~103~~105.      Each Spoof Order constitutes a separate and distinct violation of 7 U.S.C. § 6c(a)(5)(C).

### Count II—Fraud and Manipulation by Deceptive Device or Contrivance
**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2022)**

~~104~~106.      Paragraphs 1 through ~~96~~98 are re-alleged and incorporated herein by reference.

~~105~~107.      7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the

Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] . . . .

106108.        17 C.F.R. § 180.1(a), provides:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

107109.        During the Relevant Period, as described above, Serotta violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) by, among other things, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, (1) using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud, and (3) engaging, or attempting to engage, in any act, practice, or course of business, which operated or would operate as a fraud or deceit upon any person.

108110.        Serotta engaged in the acts and practices described above intentionally or recklessly.

109111.        By this conduct, including in Spoof Event Examples 1–4, Serotta violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1) and (3).

110112.      Serotta engaged in the acts, practices, or conduct described above while acting within the scope of his agency, employment, and office at Logista. Accordingly, Logista is liable pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022), as a principal for Serotta's acts, omissions, or failures in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

111113.      At all times relevant to this Complaint, Serotta controlled Logista, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Logista's conduct alleged in this Count; therefore, pursuant to 7 U.S.C. § 13c(b), Serotta is liable for Logista's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

112114.      Each act of using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud, and engaging, or attempting to engage, in any act, practice, or course of business, which operated or would operate as a fraud or deceit upon any person, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

### Count III—Failure to Supervise
### Violation of Regulation 166.3, 17 C.F.R. § 166.3 (2022)

113115.      Paragraphs 1 through 9698 are re-alleged and incorporated herein by reference.

114116.      17 C.F.R. § 166.3 provides:

Each Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) of all commodity interest accounts carried, operated, advised or introduced by the registrant and all other activities of its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) relating to its business as a Commission registrant.

115117.     During the Relevant Period, Logista was a Commission registrant and lacked an adequate supervisory structure and compliance program and/or failed to perform its supervisory duties diligently. As a result, Defendants were able to engage in disruptive trading practices, including Spoof Event Examples 1–5.

116118.     At all times relevant to this Complaint, Serotta controlled Logista, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Logista's conduct alleged in this Count; therefore, pursuant to 7 U.S.C. § 13c(b), Serotta is liable for Logista's violations of 17 C.F.R. § 166.3.

117119.     Each failure to diligently supervise, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of 17 C.F.R. § 166.3.

### Count IV—Violation of the Commission's Order

118120.     Paragraphs 1 through 9698 are re-alleged and incorporated herein by reference.

119121.     On September 29, 2017, the Commission entered the 2017 Order, which required Logista to cease and desist from violating Regulation 166.3, 17 C.F.R. § 166.3 (2017), and imposed a civil monetary penalty of $250,000. The 2017 Order was entered under the Commission's authority pursuant to Section 6(c) and (d) of the Act, 7 U.S.C. §§ 9(4), 13a-2, and Logista consented to the use of the findings and conclusions in the Order in any other proceeding brought by the Commission. Logista further agreed that the findings and conclusions of the 2017 Order "shall be taken as true and correct and be given preclusive effect therein, without further proof."

120122.     The 2017 Order provides, among other things, that "Logista failed to diligently supervise the handling by its employees and officers of commodity interest accounts

and other activities relating to Logista's business as a Commission registrant, in violation of

Regulation 166.3, 17 C.F.R. § 166.3 (2017)." More specifically, because of the "inadequate

training, direction, and supervision" of a Logista employee, the employee "repeatedly engag[ed]

in the disruptive trading practice commonly known as 'spoofing.'"

121123.        Following entry of the Order and during the Relevant Period, Logista

violated the 2017 Order by engaging in the conduct described in paragraphs 1 through 9698

above, including in Spoof Event Examples 1–5.

122124.        At all times relevant to this Complaint, Serotta controlled Logista, directly

or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Logista's

conduct alleged in this Count; therefore, pursuant to 7 U.S.C. § 13c(b), Serotta is liable for

Logista's violations of the 2017 Order.

123125.        Each violation of the Commission's 2017 Order, including but not limited

to those specifically alleged herein, constitutes a separate and distinct violation of the 2017

Order.

## VIII.   RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by

Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A.        An order finding that Defendants violated Sections 4c(a)(5)(C) and 6(c)(1)

of the Act, 7 U.S.C. §§ 6c(a)(5)(C), 9(1), Regulations 166.3 and

180.1(a)(1) and (3), 17 C.F.R. §§ 166.3, 180.1(a)(1), (3) (2022), and the

2017 Order;

B.        An order of permanent injunction enjoining each Defendant and any other

person or entity associated with them, including but not limited to

31

affiliates, agents, servants, employees, assigns, attorneys, and all persons in active concert or participation with each Defendant, including any successor thereof, from, directly or indirectly:

i.      Engaging in conduct in violation of 7 U.S.C. §§ 4c(a)(5)(C), 9(1), 17 C.F.R. §§ 166.3, and 180.1(a)(1) and (3) (2022);

ii.     Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

iii.    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)), for their own personal account(s) or for any account in which a Defendant has a direct or indirect interest;

iv.     Having any commodity interests traded on either Defendant's behalf;

v.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

vi.     Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

vii.    Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and/or

viii.     Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38), registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9));

C.     An order requiring Defendants to pay civil monetary penalties of not more than the civil monetary penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, title VII, Section 701, see Commission Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the Act or Regulations, plus post-judgment interest;

D.     An order directing Defendants, as well as any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, fees, or loans derived directly or indirectly from acts or practices which constitute violations of the Act and Regulations, as described herein, and pre-and post-judgment interest thereon from the date of such violations;

E.     An order requiring Defendants and any successors thereof to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

33

    F.     An order providing such other and further relief as the Court deems

proper.

          *      *      *

## IX.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated: ~~September 7~~November 28, 2023

COMMODITY FUTURES TRADING
COMMISSION

By: ___~~*Katherine S. Paulson*~~*/s/ Meredith
Borner*_____

~~Katherine Paulson~~
~~Trial Attorney~~
~~kpaulson@cftc.gov~~

~~Commodity Futures Trading Commission~~
~~Division of Enforcement~~
~~77 West Jackson Boulevard, Suite 800~~
~~Chicago, IL 60604~~
~~Phone: (312) 596-0700~~
~~Fax: (312) 596-0716~~

Meredith Borner, *pro hac vice* ~~pending~~
Trial Attorney
mborner@cftc.gov

Patryk Chudy, *pro hac vice* ~~pending~~
Chief Trial Attorney
pchudy@cftc.gov
~~*LEAD ATTORNEY*~~

Manal M. Sultan, *pro hac vice* pending
Deputy Director
msultan@cftc.gov

290 Broadway, 6th Floor
New York, NY 10007
Phone: (646) 746-9700
Fax: (646) 746-9888

Katherine Paulson
Trial Attorney
kpaulson@cftc.gov

Commodity Futures Trading Commission
Division of Enforcement
77 West Jackson Boulevard, Suite 800
Chicago, IL 60604
Phone: (312) 596-0700
Fax: (312) 596-0716

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION