**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | Case No. 1:23-cv-07485 |
| v. | Hon. John F. Kness |
| LOGISTA ADVISORS LLC and ANDREW HARRIS SEROTTA, | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

Meredith Borner (*pro hac vice*)
Lara Turcik (*pro hac vice*)
Patryk J. Chudy (*pro hac vice*)
Manal M. Sultan (*pro hac vice* pending)
Commodity Futures Trading Commission
Division of Enforcement
290 Broadway, 6th Floor
New York, NY 10007
Phone: (646) 746-9700
Fax: (646) 746-9888

Katherine Paulson
Commodity Futures Trading Commission
Division of Enforcement
77 West Jackson Boulevard, Suite 800
Chicago, IL 60604
Phone: (312) 596-0700
Fax: (312) 596-0716

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION

**Table of Contents**

I.      INTRODUCTION ................................................................................................. 1

II.     FACTS ALLEGED IN THE AMENDED COMPLAINT ................................. 3

III.    LEGAL STANDARD .......................................................................................... 5

IV.     ARGUMENT ....................................................................................................... 7

        A.      The Complaint Satisfies the Rule 9(b) Particularity Requirements ...................... 7

        B.      Defendants' Fraudulent Intent to Spoof and to Manipulate Is Adequately
                Alleged ............................................................................................................... 8

                1.      Parsing the Individual Elements of the Alleged Trading Pattern Is
                        Improper ................................................................................................. 8

                2.      Defendants Quibble with the Definition of "Spoof Events" but Fail to
                        Address the Statistics and Specific Examples of Spoofing Alleged ......... 10

                        a.      *Defendants' Objections to the Alleged Fill Rates Are Misplaced*
                                ........................................................................................ 10

                        b.      *Defendants Fail to Address the Spoof Event Examples Alleged*. 122

                3.      The Duration of Spoof Events Is Not Determinative of Intent ................. 13

        C.      The Amended Complaint Is Not Required to Allege Additional Information or
                Statistics to Plead Scienter Adequately ............................................................. 15

        D.      The Amended Complaint Is Not Required to Allege Market Impact ................... 18

        E.      The Amended Complaint States Claims for Failure to Supervise (Count III) and
                Violation of the 2017 Order (Count IV) ............................................................ 21

V.      CONCLUSION .................................................................................................. 23

## Table of Authorities

**Cases**

*In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513 (S.D.N.Y. 2008) .................. 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................... 5

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007 ......................................... 20

*CFTC v. Caniff*, Case No.19-cv-2935, 2020 WL 956302 (N.D. Ill. Feb. 27, 2020) ............. 6, 7, 8

*CFTC v. Kraft*, 153 F. Supp. 3d 996 (N.D. Ill. 2015) ........................................ 6, 18, 20

*CFTC v. Oystacher*, 203 F. Supp. 3d 934 (N.D. Ill. 2016) ............................................... 16, 17, 18

*CFTC v. S. Tr. Metals, Inc.*, No. 14-22739, 2016 WL 4523851 (S.D. Fla. Aug. 29, 2016) ......... 20

*CFTC v. Shak*, Case No. 2:22-cv-01258-GMN-NJK, 2023 WL 5717289 (D. Nev. Sept. 5, 2023) ................................................................................................ 17, 19

*CFTC v. Skudder*, No. 22 CV 1925, 2022 WL 17752392 (N.D. Ill. Dec. 19, 2022).. 13, 16, 17, 18

*CFTC v. Thakkar*, 1:18-cv-00619 (N.D. Ill. Jan. 28, 2018), ECF No. 1 ..................................... 14

*CFTC v. Thakkar*, 1:18-cv-00619 (N.D. Ill. Sept. 14, 2020), ECF No. 67 .................................. 14

*DH2, Inc. v. Athanassiades*, 404 F. Supp. 2d 1083 (N.D. Ill. 2005) ........................................... 20

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) ............................................................. 6, 7

*EEOC v. AutoZone, Inc.*, 707 F.3d 824 (7th Cir. 2013) ............................................................. 23

*FERC v. Vitol Inc.*, No. 2:20-CV-00040-KJM-AC, 2021 WL 6004339 (E.D. Cal. Dec. 20, 2021) ................................................................................................ 8, 9

*In re FSI Futures, Inc.*, CFTC No. 95-9, 1997 WL 693554 (Aug. 1, 1997) (S.D.N.Y. 2008) ..... 21

*Gibson v. City of Chi.*, 910 F.2d 1510 (7th Cir. 1990) ................................................................ 5

*In re GNP Commodities, Inc.*, CFTC No. 89-1, 1992 WL 201158 (Aug. 11, 1992) ................... 21

*In re Interactive Brokers LLC*, CFTC No. 22-18, 2022 WL 20358892 (June 30, 2022) ............ 21

*Koch v. SEC*, 793 F.3d 147 (D.C. Cir. 2015) ............................................................................. 19

*Markowski v. SEC*, 274 F.3d 525 (D.C. Cir. 2001) ...................................................................... 8

*Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328 (7th Cir. 2019) ..................................................... 6

*SEC v. Benger*, 697 F. Supp. 2d 932 (N.D. Ill. 2010) .................................................. 6, 8

*SEC v. Fiore*, 416 F. Supp. 3d 306 (S.D.N.Y. 2019) ............................................... 19, 20

*SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49 (S.D.N.Y. 2017) ................................... 8, 20

*SEC v. Ogle*, No. 99 C 609, 2000 WL 45260 (N.D. Ill. Jan. 11, 2000) ......................... 6

*Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64 (2d Cir. 2021) ........................... 8

*Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891 (7th Cir. 2018) .................................. 5

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007) ................................. 7

*United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017) ...................................... *passim*

*United States v. Molina Healthcare of Ill., Inc.*, 17 F.4th 732 (7th Cir. 2021) ............. 7

*United States v. Smith*, No. 1:19-CR-00669-1, 2, 2023 WL 8230811 (N.D. Ill. Aug. 21, 2023) .................................................................................................................. 14

## Statutes

7 U.S.C. § 6(b) ............................................................................................................ 22

7 U.S.C. § 6c(a)(5)(c) .......................................................................................... 1, 6, 18

7 U.S.C. § 9(1) ........................................................................................................ 1, 5

7 U.S.C. § 13(a)(2) ..................................................................................................... 19

## Other Authorities

17 C.F.R. § 30.4 (2023) .............................................................................................. 22

17 C.F.R. Pt. 48 (2023) ............................................................................................... 22

17 C.F.R. § 48.4(b) (2023) .......................................................................................... 22

17 C.F.R. § 48.8(a)(5)(i) (2023) .................................................................................. 22

17 C.F.R. § 166.3 (2023) ........................................................................................ 2, 22

17 C.F.R. § 180.1 (2023) ......................................................................................... 1, 5

17 C.F.R. § 180.2 (2023) ............................................................................................ 19

Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398-01 (July 14, 2011) ... 6, 19

**Rules**

Fed. R. Civ. P. 12(b)(6)..................................................................................................... 5

Fed. R. Civ. P. 9(b) .......................................................................................................... 6

## I. INTRODUCTION

The Commission's[1] amended complaint ("AC" or "Amended Complaint") asserts that from at least January 2020 through at least April 2020, Logista, acting through its head trader, principal, and chief executive officer, Andrew Serotta, engaged in manipulative and deceptive acts and practices in the natural gas futures and crude oil futures markets, while placing orders for and trading futures contracts on a registered entity. By placing hundreds of orders with the intent to cancel them before execution, Defendants intentionally or recklessly sent false signals of increased buying or selling interest designed to trick other market participants into entering higher bids or lower offers, allowing Defendants to execute orders on the opposite side of their order book at advantageous prices.

The Amended Complaint contains detailed allegations about the natural gas and crude oil futures markets, how spoofing impacts the futures markets, and how Defendants engaged in spoofing and manipulative and deceptive schemes. It alleges that Defendants placed orders with the intent to cancel or deceive other market participants and supports those allegations with statistical analyses and detailed examples of specific misconduct. The Amended Complaint alleges that Defendants have engaged, are engaging, or are about to engage in manipulative and deceptive acts and practices in violation of the Act and Regulations—specifically, Sections 4c(a)(5)(C) and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(a)(5)(C), 9(1), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2023). It further alleges that Logista failed to provide supervision adequate to prevent Serotta from engaging in spoofing and manipulative and deceptive trading practices. Through this conduct, Defendants have engaged,

---

[1] Except as otherwise noted, Plaintiff uses capitalized terms as defined in the Amended Complaint.

are engaging, or are about to engage in violations of Regulation 166.3, 17 C.F.R. § 166.3 (2023), and the 2017 Order's requirement that Logista cease and desist from violating Regulation 166.3.

Defendants move to dismiss the Amended Complaint, arguing generally that the spoofing and manipulative and deceptive device claims (Counts I and II) do not satisfy Rule 9(b) and fail to allege scienter, and that the claims for failure to supervise and violation of the 2017 Order (Counts III and IV) fail to state a claim.

Defendants' arguments lack merit, and the motion should be denied. Defendants' motion ("MTD") raises arguments regarding the merits of the case and asks the Court to draw inferences in their favor, which is not appropriate on a motion to dismiss. Rather than engage with the specific misconduct alleged in the Amended Complaint—which includes detailed examples of Serotta's spoofing, as well as analysis of the order book imbalance and fill and cancel rates resulting from his Spoof Orders—Defendants' motion attempts to obfuscate these allegations by: (i) parsing Defendants' trading to assert that, because individual characteristics of Serotta's trading *can be* associated with legal trading, Serotta's spoofing scheme was necessarily permissible; (ii) criticizing the Amended Complaint's definition of Spoof Order, while largely ignoring the five detailed examples of spoofing activity it alleges; and (iii) incorrectly asserting that the Commission must allege additional statistics or information to state a claim.

Of course, the Amended Complaint does not allege that Defendants engaged in misconduct simply by placing large orders; placing resting orders; placing orders on both sides of the market; placing orders that are not at the best-price level; or canceling orders. Instead, the Amended Complaint alleges that, when viewed in their totality, Defendants' actions establish a pattern of trading—comprised of a number of carefully selected characteristics and several

representative examples—that supports an inference that Serotta placed hundreds of orders with the intent to cancel or to mislead other market participants, to the benefit of Defendants. Accordingly, Defendants' motion to dismiss should be denied.

## II.     FACTS ALLEGED IN THE AMENDED COMPLAINT

The Amended Complaint alleges a trading scheme through which Defendants repeatedly placed orders that they intended to cancel in an effort to mislead other market participants about the level of interest in certain futures contracts traded on NYMEX.  By placing these misleading orders, Defendants tricked other market participants into trading at a time, price, or quantity they otherwise would not have absent the Spoof Orders.  (AC ¶¶ 52, 55.)  The Amended Complaint alleges three examples of individual Spoof Events that occurred on January 29, 2020, February 20, 2020, and March 11, 2020.  (*Id.* ¶¶ 71–82.)  Each example includes specific facts setting forth a simple four-step pattern that supports an inference that Defendants intended to cancel the Spoof Orders at the time the orders were placed, in an effort to mislead other market participants.

*First*, for each of these three examples, the Amended Complaint alleges that Serotta placed a 301-lot Spoof Order at the best or second-best price level, and that the Spoof Orders were protected from execution by the volume already resting at the best bid or offer or second-best price level.  The Amended Complaint also identifies the average order size at that price level prior to the placement of the Spoof Order (*id.* ¶ 72 (6 lots); *id.* ¶ 76 (3 lots); and *id.* ¶ 80 (4 lots)), which was in each case far smaller than the 301-lot Spoof Order placed by Serotta.  The Amended Complaint outlines the impact that Defendants' placement of Spoof Orders had on the order book imbalance (*id.* ¶ 72 (Spoof Order constituted 51% of the orders at that price level, doubling resting volume at that level); *id.* ¶ 76 (Spoof Order constituted almost 90% of the

orders at that price level, increasing resting volume at that level by approximately 860%); *id.* ¶ 80 (Spoof Order constituted almost 80% of the orders at that price level, increasing resting volume at that level by 390%)), which other market participants look to as an indication of the level of interest in purchases or sales in the market (*id.* ¶ 52).

*Second*, for each of the three examples, the Amended Complaint alleges that, shortly after placing the 301-lot Spoof Order, Defendants began placing a series of Genuine Orders—that is, smaller orders on the opposite side of the market from the Spoof Order, which Defendants intended to fill. (*Id.* ¶¶ 73, 77, 81.)

*Third*, for each of the three single Spoof Order episodes, the Amended Complaint alleges that Defendants succeeded in getting fills on the smaller Genuine Orders, consistent with Defendants' intent that the Genuine Orders fill. (*Id.*)

*Finally*, for each of these examples, the Amended Complaint alleges the Spoof Order received zero fills and was completely cancelled. (*Id.* ¶¶ 74, 78, 82.) As a result, Defendants had a 0% fill rate, or a 100% cancellation rate, on the Spoof Orders in these three examples.

Plaintiff's Amended Complaint also alleges two examples in which Defendants executed a series of Spoof Events. In Spoof Event Example 4, the Amended Complaint alleges that over the course of about sixteen minutes, Defendants engaged in the spoofing pattern described above twelve times, generally flipping back and forth the side of the market on which the Spoof Order and the Genuine Orders were placed. (*Id.* ¶¶ 83–86.) In Spoof Event Example 5, over approximately eighteen minutes, Defendants are alleged to have engaged in a spoofing sequence nineteen times, in which they repeatedly placed Spoof Orders on alternating sides of the market. (*Id.* ¶¶ 93–94.) Again, Defendants' fill rate on the numerous Spoof Orders in these two sequences was 0%, meaning that Defendants canceled every Spoof Order in full. (*Id.* ¶¶ 87, 96.)

4

In addition to the specific Spoof Event examples alleged, the Amended Complaint presents statistical evidence that further supports the allegations regarding Defendants' intent to cancel the Spoof Orders.  In particular, the Amended Complaint cites statistics demonstrating that only 1.42% of the contracts in Defendants' Spoof Orders filled, whereas 29.62% of the contracts in Defendants' Large, Non-Spoof-Event Orders ("LNSEO") (*i.e.*, orders of 200 or more contracts that do not meet all the criteria of a Spoof Event) filled.  (*Id.* ¶ 65.)  Relatedly, while the Spoof Orders rested on the market for a median of 52 seconds, LNSEO rested for a median of 188 seconds.  (*Id.*)  Statistics alleged in the Amended Complaint also illustrate the discrepancy between Defendants' Spoof Orders and Genuine Orders:  Again, only 1.42% of the contracts in the Spoof Orders filled, as compared to 64.92% of the contracts in the Genuine Orders.  (*Id.* ¶ 66.)  In total, the Amended Complaint identifies and sets forth significant detail about a total of 34 specific Spoof Events.  The patterns alleged in the trading sequences support a reasonable inference of Defendants' intent to cancel the Spoof Orders and to mislead market participants.

### III.    LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case.  *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990).  In considering a motion to dismiss under Rule 12(b), the Court must construe all factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 893 (7th Cir. 2018).  To survive a motion to dismiss, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Assuming, as Defendants contend, that Sections 4c(a)(5)(C) and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(a)(5)(C), 9(1), and Regulation 180.1, 17 C.F.R. § 180.1(a)(1), (3) (2023), sound in

fraud, Rule 9(b)'s heightened pleading requirement would apply to Counts I and II.[2]  (MTD at 8–9.)  Rule 9(b) "requires the plaintiff to state 'with particularity' any 'circumstances constituting fraud.'"  *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).  That is, the Amended Complaint must plead the "who, what, when, where, and how" of the fraud.  *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019).  "Rule 9 requires a plaintiff to identify the person who made the misrepresentation; the time, place and content of the misrepresentation; and the method used to communicate the misrepresentation."  *SEC v. Ogle*, No. 99 C 609, 2000 WL 45260, at *5 (N.D. Ill. Jan. 11, 2000).  "Rule 9(b) should be applied with an eye toward fulfilling the Rule's underlying purposes"—including informing Defendants of the claims against them and enabling them to form an adequate defense.  *SEC v. Benger*, 697 F. Supp. 2d 932, 938 (N.D. Ill. 2010) (quotations omitted).[3]

Under Rule 9(b), intent may be alleged generally, so long as there is "some basis" for believing the plaintiff can prove scienter.  *CFTC v. Caniff*, Case No. 19-cv-2935, 2020 WL 956302, at *7 (N.D. Ill. Feb. 27, 2020); *see also* Fed. R. Civ. P. 9(b) ("[I]ntent . . . may be alleged generally.").  In other words, the Amended Complaint must allege "sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind."

---

[2] Plaintiff does not concede that Rule 9(b) applies to Section 4c(a)(5)(C) or that a violation of Section 9(1) or Regulation 180.1(a)(1) necessarily sounds in fraud in order to constitute illegal manipulative conduct. Nevertheless, it submits that the Amended Complaint has satisfied the pleading requirements of Rule 9(b) as to both Counts I and II, particularly in light of the requirement that intent need only be alleged generally.  As a result, Plaintiff does not address Defendants' argument as to the pleading standard further.

[3] Section 6(c)(1) and Rule 180.1 are modeled after Section 10(b) of the Exchange Act and SEC Rule 10b-5, respectively.  *See* Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398-01, 41399 (July 14, 2011). "[C]ase law interpreting Section 10(b)" is thus "instructive" as to Section 6(c)(1), and courts are guided, but not controlled, by the substantial precedent interpreting Rule 10b-5 when interpreting Regulation 180.1.  *See CFTC v. Kraft Foods Grp.*, 153 F. Supp. 3d 996, 1009 & n.3 (N.D. Ill. 2015).

*Caniff*, 2020 WL 956302, at *7.  In assessing intent, the Court must consider the "complaint in its entirety" to determine "whether all of the facts alleged, taken collectively," support an inference of scienter.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *Caniff*, 2020 WL 956302, at *7 (applying *Tellabs* to CFTC enforcement action).

## IV.  ARGUMENT

### A.  The Complaint Satisfies the Rule 9(b) Particularity Requirements

The CFTC's Amended Complaint—which sets forth at length the mechanics of trading in futures markets, how spoofing disrupts those markets, and how Defendants engaged in spoofing and manipulative and deceptive schemes, before detailing five specific examples of Defendants' alleged spoofing sequences—plainly satisfies the requirements under Rule 9(b) that it "state with particularity the circumstances constituting fraud" and "allege[] generally" Defendants' intent.

Rule 9(b) "requires specificity, but it does not insist that a plaintiff literally prove his case in the complaint."  *United States v. Molina Healthcare of Ill., Inc.*, 17 F.4th 732, 741 (7th Cir. 2021).  As Defendants acknowledge (MTD at 9), in order to meet the requirements of Rule 9(b), the Amended Complaint must simply allege the "who, what, when, where, and how" of the alleged fraud.  *DiLeo*, 901 F.2d at 627.  The Amended Complaint has done just that.

- **Who:**  Andrew Harris Serotta and Logista Advisors LLC;

- **What:**  Placing orders that Serotta intended to cancel and did cancel, to deceive other market participants about supply and demand in natural gas and crude oil calendar spread futures markets;

- **When:**  From January 2020 through April 2020;

- **Where:**  On NYMEX, a registered entity;

- **How:**  By using Spoof Orders—identified by detailed parameters in the Amended Complaint—to create market imbalances that tricked or deceived other market participants about supply and demand and allowed Serotta to execute his Genuine Orders in larger quantities and at better prices than he otherwise would have.

The 23-page motion to dismiss reinforces that the Amended Complaint has fulfilled Rule 9(b)'s "underlying purposes . . . to inform the defendants of claims against them and to enable them to form an adequate defense." *Benger*, 697 F. Supp. 2d at 937. In response, Defendants have set up and attempted to debunk a series of straw-man arguments at the outskirts of the Amended Complaint's allegations, instead of addressing its well-pled allegations, including the examples of Spoof Events that have put Defendants on notice of the central misconduct alleged.

**B.** **Defendants' Fraudulent Intent to Spoof and to Manipulate Is Adequately Alleged**

    **1.** **Parsing the Individual Elements of the Alleged Trading Pattern Is Improper**

Rather than accepting the appropriate legal standard—that the Court should evaluate the Amended Complaint in its totality to determine whether all of the facts alleged support an inference of intent, *see United States v. Coscia*, 866 F.3d 782, 796 (7th Cir. 2017); *Caniff*, 2020 WL 956302, at \*7—Defendants attempt to isolate individual aspects of the trading patterns alleged and argue that, because those aspects *can be* associated with permissible trading, Defendants must also have deployed them legally here. (*See* MTD at 11–15.) Therefore, Defendants claim, the allegations of scienter must be insufficient.

Defendants' argument is fatally flawed because it ignores settled law that "[m]arket manipulation can be accomplished through otherwise legal means." *SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 60 (S.D.N.Y. 2017). "In some cases, . . . scienter is the only factor that distinguishes legitimate trading from improper manipulation." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 77 (2d Cir. 2021) (citation omitted); *see also Markowski v. SEC*, 274 F.3d 525, 529 (D.C. Cir. 2001) (accepting SEC's interpretation of Section 10(b) of the Exchange Act in light of "Congress's determination that 'manipulation' can be illegal solely because of the actor's purpose"); *FERC v. Vitol Inc.*, No. 2:20-CV-00040-KJM-AC, 2021 WL 6004339, at \*17

(E.D. Cal. Dec. 20, 2021) ("[F]acially legitimate trades might be 'manipulative' under section 10(b) if those trades were intended to deceive.").

The same framework applies to commodities trading. *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 534 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013). "Because every transaction signals that the buyer and seller have legitimate economic motives for the transaction, if either party lacks that motivation, the signal is inaccurate. Thus, a legitimate transaction combined with an improper motive is commodities manipulation." *Id.*

The Seventh Circuit recognized this principle in the context of spoofing in *Coscia*, holding that "[t]he fundamental difference is that legal trades are cancelled only following a condition subsequent to placing the order, whereas orders placed in a spoofing scheme are never intended to be filled at all." 866 F.3d at 795. In other words, the dispositive factor in assessing the legality of an order is the trader's intent at the time the order was placed.

As such, Defendants' arguments that individual characteristics of Serotta's trading—such as the size of the orders and his placement of orders on both sides of the market simultaneously—can constitute permissible trading conduct under some circumstances is irrelevant. The allegations in the Amended Complaint do not broadly condemn vast categories of trading that occur in the futures markets every day. Rather, the Commission has identified a specific pattern of illegal trading repeatedly undertaken by Serotta that is defined by a series of parameters. (*See* AC ¶ 53.) When all of these parameters are satisfied, the Commission alleges, the orders bear sufficient indicia of Serotta's intent to cancel at the time the orders were placed to classify them as illegal Spoof Orders. This, and not the many types of trading defended in the motion to dismiss (*see* MTD at 11–15), is the misconduct at the core of the Amended Complaint's allegations in support of Counts I and II. The Court should reject Defendants'

improper attempt to disassemble the Commission's allegations into fragments that do not accurately reflect the whole of the Amended Complaint's allegations as to Defendants' intent.

### 2. Defendants Quibble with the Definition of "Spoof Events" but Fail to Address the Statistics and Specific Examples of Spoofing Alleged

Defendants' motion engages in a convoluted exercise of challenging the difference between Spoof Orders and LNSEO. (MTD at 10–11.) The import of this observation appears to be that the Amended Complaint's definition of Spoof Orders may be underinclusive, in that it would not capture putative attempts at spoofing that did not succeed in getting any fills on the corresponding genuine orders. However, an argument that the Amended Complaint employs a conservative definition of Spoof Orders is not an appropriate basis to dismiss the complaint.

Defendants' arguments are merely an attempt to distract from the well-pled allegations that support an inference of Defendants' intent: the contrast in fill rates and median durations of Spoof Orders and LNSEO, the disparity in fill rates for Spoof Orders and Genuine Orders, and the concrete Spoofing Examples. Any factual questions Defendants pose about the interpretation of data and trading activity are not valid grounds for dismissal at the pleading stage.

### a. *Defendants' Objections to the Alleged Fill Rates Are Misplaced*

First, the Amended Complaint sufficiently alleges facts supported by statistical analyses that support an inference of Defendants' intent. The chart setting forth the comparative fill rates and median durations of Spoof Orders and LNSEO demonstrates that the percentage of contracts filled was substantially higher for LNSEO than for Spoof Orders. (AC ¶ 65.) This disparity supports the inference that, when Serotta intended to get fills on his large orders, he was able to

10

do so (*i.e.*, by placing orders with the characteristics of LNSEO);[4] when he wanted to avoid fills on his large orders, he was similarly able to do so (*i.e.*, by placing orders with the characteristics of Spoof Orders). Consistent with Serotta's differing intent as to the two categories of orders—and as demonstrated in this chart—Serotta canceled Spoof Orders much more quickly (mediation duration of 52 seconds) than LNSEO (median duration of 188 seconds). (*Id.*)

Defendants' only quibble with this comparison is that LNSEO will necessarily have a higher fill rate than Spoof Orders because the former category includes all fully filled orders for 200 or more contracts. (*See* MTD at 15–16.) Because intent to cancel before execution is the *sine qua non* of a Spoof Order, it simply makes sense to exclude orders that were never canceled from the set of Spoof Orders in the first instance. Regardless, any objection to the magnitude of the discrepancy between the fill rates of Spoof Orders and LNSEO fails to take the well-pled allegations as true and goes to the weight of the evidence, not the sufficiency of the pleadings.

The Amended Complaint also compares the fill rates of Spoof Orders and Genuine Orders that were part of Serotta's Spoof Events: 1.42% of the contracts in Spoof Orders filled, whereas almost 65% of the contracts in Serotta's Genuine Orders filled. (AC ¶ 66.) Defendants label this discrepancy "meaningless," because many of Serotta's Genuine Orders were entered aggressively (and therefore were guaranteed to execute, at least in part), whereas his Spoof Orders were all resting orders (that were thus not guaranteed to execute). (MTD at 16.) This statistical difference between Genuine Orders and Spoof Orders is far from meaningless, however; it instead reflects the difference in Serotta's intent regarding the two types of orders.

---

[4] For example, 40.3% of Serotta's LNSEO were entered aggressively, meaning that they were guaranteed to fill in part or in full. (AC ¶ 65 n.3.) Placement of such orders aggressively would be consistent with an intent to fill, rather than an intent to cancel. Conversely, because the Amended Complaint defines Spoof Orders to include only resting orders, the percentage of Spoof Orders placed aggressively is zero.

Entering an order aggressively connotes an intent that the order fill. It is unsurprising, and consistent with the overall scheme, that many of Serotta's Genuine Orders were entered aggressively, since he actually wanted those orders to fill. Thus, the difference in the fill rate for these two types of orders supports an inference that Serotta intended to cancel certain orders before execution, while showing that Serotta was able to get fills when he intended to do so.

Defendants further allude to the difference in fill rates between LNSEO and Genuine Orders as a reason to discount the statistics cited in Paragraph 66. As an initial matter, Defendants assert that "the CFTC agrees that the 'Large *Non*-Spoof Orders' are legitimate orders, despite their very different fill rates from 'Genuine Orders.'" (MTD at 16.) Nowhere does the Amended Complaint bless Serotta's LNSEO as "legitimate."[5] Defendants' argument not only rests on a faulty premise, but also represents an improper attempt to shift the burden onto Plaintiff, which—counter to Defendants' suggestion—is not obligated to "explain why those two types of admittedly legitimate orders – large and small – have such disparate fill rates" (*id.* at 16–17). Rather, the Amended Complaint adequately alleges that the Spoof Orders have significantly lower fill rates than either the LNSEO or the Genuine Orders, which gives rise to an inference that Serotta intended to cancel the Spoof Orders before execution.

      b.    *Defendants Fail to Address the Spoof Event Examples Alleged*

Moreover, Defendants almost entirely disregard the five Spoof Event Examples alleged in the Amended Complaint (¶¶ 70–97). As to Spoof Event Examples 1–3, Defendants argue that the Amended Complaint should have alleged an expected fill rate for the Genuine Orders and did not, and that the Genuine Orders should have executed at a higher rate than they did in response

---

[5] The fact that a particular order did not fall within the strict parameters applied to define a Spoof Order does not preclude that it was, nonetheless, placed with the intent to cancel the order before execution.

to Serotta's Spoof Orders. (MTD at 20.) As discussed *infra* Section IV.C, the Amended

Complaint need not allege such statistics to state a claim.

With respect to Spoof Event Examples 4 and 5, in which Serotta repeatedly flipped his

Spoof Orders across alternating sides of the market, Defendants' somewhat incredible response

is that "[s]urely, no market participant was tricked" by Serotta's trading activity, because any

market participant should have reached the "reasonable conclusion" that it was Serotta trading on

both sides of the market based on the "unique" characteristics of his trading. (*Id.* at 21.) In other

words, Defendants are disputing the factual allegations in the Amended Complaint by suggesting

that counterparties were, or should have been, aware that Serotta was responsible for the Spoof

Orders on both sides of the market.

### 3. The Duration of Spoof Events Is Not Determinative of Intent

Defendants attack the Amended Complaint based on an argument that the length of time

the Spoof Orders were left open on the market is inconsistent with manipulation. (*Id.* at 17–

19.) Again, Defendants are wrong: Intent, not speed, defines spoofing. *See CFTC v. Skudder*,

No. 22 CV 1925, 2022 WL 17752392, at *7 (N.D. Ill. Dec. 19, 2022). As such, there is no

bright-line limit on the amount of time a spoof order can be left open on the market.

In *Skudder*, the court denied defendants' motion to dismiss, which had argued that the

CFTC had failed to allege intent because defendants' spoof orders were left on the market for up

to 30 seconds, an amount of time that was purportedly inconsistent with intent to cancel. *See id.*

The court rejected that argument, holding, "[T]hat Skudder left the alleged spoof orders exposed

to the market for some length of time isn't necessarily inconsistent with an intent to cancel." *Id.*

Instead, the court found that the CFTC had adequately pleaded that "Skudder placed his orders in

such a way as to move the market in favor of his smaller, genuine orders, consistent with a

13

deceptive intent." *Id.* at *8. "That the pattern of trading alleged in this complaint is different than that at issue in other cases isn't a reason to dismiss the CFTC's claims." *Id.*

Even courts in the criminal context have recognized that longer durations can form a predicate for spoofing violations. In *United States v. Smith*, in which the defendants were convicted of attempted price manipulation, wire fraud, commodities fraud and spoofing, the court entered an order calculating loss amounts for sentencing purposes. No. 1:19-CR-00669-1, 2, 2023 WL 8230811 (N.D. Ill. Aug. 21, 2023). In assessing the spoof orders to be included in the loss calculations, the court used the longest durations that the respective defendants left orders open in the trial evidence sequences—36.165 seconds for Smith and 34.875 seconds for Nowak. *Id.* at *3. The court observed that, while the "maximum durations are significantly longer than what would result from the super-fast-cancellation clicking that formed the core . . . of the trial evidence . . . [,] that does not alter the fact, certainly proven by a preponderance, that even the half-minute or so cancellations represented cancellations that would otherwise make no economic sense and did not incorporate anything that happened post-placement that the Defendants were taking into account." *Id.* As such, "nothing other than spoofing persuasively explains what the Defendants were doing even at the 34-second or 36-second durations." *Id.*

In any case, the duration of the Spoof Orders at issue in the Amended Complaint is not without precedent in spoofing cases previously brought by the Commission. Defendants ignore *CFTC v. Thakkar*, which cited spoof orders that remained open for about 46 seconds and up to two minutes. Complaint at 14–15, *CFTC v. Thakkar*, 1:18-cv-00619 (N.D. Ill. Jan. 28, 2018), ECF No. 1; Consent Order, *CFTC v. Thakkar*, 1:18-cv-00619 (N.D. Ill. Sept. 14, 2020), ECF No. 67 (finding company liable under Sections 4c(a)(5)(C) and 6(c)(1) and Regulation 180.1(a)). Defendants also focus on the three-minute outer limit of the Spoof Orders identified in the

Amended Complaint and the 52-second median duration. (MTD at 17–19.) As noted above, they have little to say about the specific Spoof Event Examples, including those in which the Spoof Order is open for much less than the median duration—namely, Example 1 (in which the Spoof Order remained open for approximately 16.615 seconds; Example 4 (in which Serotta "flipped" the Spoof Orders across the market, with a median duration of 33.2 seconds across twelve episodes); and Example 5 (another "flipping" example with a median duration of 36.9 seconds involving nineteen episodes).

The allegations, taken as true and as a whole, and with all reasonable inferences drawn in Plaintiff's favor, are more than enough to support an inference that Defendants acted with the required intent and to satisfy the pleading requirements under the Federal Rules.

## C. The Amended Complaint Is Not Required to Allege Additional Information or Statistics to Plead Scienter Adequately

In their motion, Defendants present a wish list of allegations they assert the CFTC should have pled in its Amended Complaint—for example, whether LNSEO were the majority of order volume at their price levels (MTD at 11), average trading and cancellation volumes in the markets at issue (*id.* at 17), and the fill rate and price at which Genuine Orders would have executed absent Defendants' Spoof Orders (*id.* at 19, 20). But courts have consistently held that complaints alleging facts comparable to those in the Amended Complaint state a claim for spoofing (Count I) and fraud and manipulation by deceptive device (Count II). To the extent they are even relevant, the statistics Defendants seek would be more properly developed during fact or expert discovery, and resolved on the merits.

The Seventh Circuit explained in *Coscia*: "As in all cases based upon circumstantial evidence, no single piece of evidence necessarily establishes spoofing," but a violation could nonetheless be proven if the "cumulative evidence," "when evaluated in its totality, . . . allowed

a rational trier of fact to determine that Mr. Coscia entered his orders with the intent to cancel them before their execution." 866 F.3d at 796.[6]  And, "because proof of intent is often based on circumstantial evidence, 'manipulative intent must normally be shown inferentially from the conduct of the accused.'"  *Oystacher*, 203 F. Supp. 3d at 944 (citation omitted).

In *Skudder*, the court denied a motion to dismiss for failure to plead intent under Rule 9(b).  It rejected defendants' argument that "the complaint merely alleges lawful trading activity," where the complaint "detail[ed] the structure, aim, and results of the alleged schemes." *Skudder*, 2022 WL 17752392, at *8, *6.  The specific allegations credited by the court as sufficient to plead defendants' intent included the parameters used to define the scheme; the use of large spoof orders to "create[] imbalance in the market and put pressure in the direction of [defendant's] genuine orders"; the total number of spoof events, as well as specific examples of alleged spoofing; a comparison of fill rates for spoof event orders and large orders that were not part of spoof events; a comparison of fill rates for spoof orders and genuine orders; a comparison of the duration of spoof orders and large orders that were not part of spoof events; and the "results of the alleged spoofing: how [defendant] deceived the market about supply and demand and made his genuine orders more attractive."[7]  *Id.* at *6–7.  The Amended Complaint pleads

---

[6] Although *Coscia* dealt with post-trial findings of fact, its evaluation of what a "rational trier of fact," 866 F.3d at 796, could conclude is relevant here, where "all reasonable inferences are drawn in favor of the non-movant." *CFTC v. Oystacher*, 203 F. Supp. 3d 934, 939 (N.D. Ill. 2016).

[7] In fact, defendants in *Skudder* argued that the complaint was deficient because it failed to allege that Skudder placed his spoof orders at or near the best bid/ask price (where they would be most influential) or that he placed spoof orders behind existing orders to decrease the risk of execution.  2022 WL 17752392, at *8.  The Amended Complaint alleges facts relating to both of these topics.  (AC ¶¶ 68, 72, 76, 80.)  The court acknowledged that such allegations "would have made an inference of intent more obvious," but nonetheless held the allegations as to intent were sufficient because the complaint "show[ed] that Skudder placed his orders in such a way as to move the market in favor of his smaller, genuine orders, consistent with a deceptive intent." 2022 WL 17752392, at *8.  The *Skudder* court was also untroubled by the fact

analogous allegations as to *each and every one* of these facts.  (*See* AC ¶ 53 (parameters of scheme); *id.* ¶¶ 52, 54 (use of large spoof orders to create market imbalance); *id.* ¶ 56 (total number of Spoof Events); *id.* ¶¶ 70–97 (specific examples of Spoof Events); *id.* ¶ 65 (comparison of fill rates for Spoof Orders and LNSEO); *id.* ¶ 66 (comparison of fill rates for Spoof Orders and Genuine Orders); *id.* ¶ 65 (comparison of median time before cancellation of Spoof Orders and LNSEO); *id.* ¶¶ 55, 60–62 (results of spoofing in misleading market).)

*Skudder* is far from alone in finding that allegations like those in the Amended Complaint are sufficient to state a claim.  In *Oystacher*, the court found that the allegations as to defendants' intent were sufficient where the Commission presented "a detailed description of Defendant Oystacher's trading patterns, relevant market data, and examples of his trading it alleges constitute spoofing."  203 F. Supp. 3d at 944.[8]  In particular, the court pointed to allegations that defendants would profit from the scheme by "creat[ing] the false impression of sudden book pressure on one side of the market, so as to fraudulently induce other market participants to place orders at prices they otherwise would not have placed under regular market conditions, absent Defendants' spoofing," and defendants' placement of orders "at or near the best bid or offer price shielded by existing orders."  *Id.* at 945.  Again, the Amended Complaint includes analogous allegations in support of Defendants' intent to cancel.  (*E.g.*, AC ¶¶ 52, 55, 68); *see also CFTC v. Shak*, Case No. 2:22-cv-01258-GMN-NJK, 2023 WL 5717289, at *4 (D. Nev. Sept. 5, 2023)

---

that the complaint had not alleged "how fast the market for soybeans futures and options contracts was moving during the period in question."  *Id.* at *7.

[8] The court in *Oystacher* denied defendants' motion for judgment on the pleadings, which "is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6)."  203 F. Supp. 3d at 939.  The court rejected as "patently false" the argument that the complaint made only "conclusory" allegations of intent and found instead that the complaint presented "a plethora of circumstantial evidence" alleging an intent to cancel.  *Id.* at 944.

(denying motion to dismiss under Rule 9(b) where defendant allegedly "placed and canceled Spoof Orders with the intent to deceive other market participants, allege[d] circumstantial facts that support those allegations, and describe[d] seven representative examples in great detail").

In short, the Amended Complaint properly relies on myriad allegations of circumstantial evidence of Defendants' intent, many of which have been endorsed by courts previously as sufficient to state a claim for spoofing. The additional statistics that Defendants purport are lacking simply are not required to be pled at this early stage in order for Defendants' intent to be "alleged generally," consistent with Rule 9(b).

**D. The Amended Complaint Is Not Required to Allege Market Impact**

Neither Count I (spoofing) nor Count II (use of a deceptive or manipulative device) requires an allegation of market impact. *CFTC v. Kraft Foods Grp.*, 153 F. Supp. 3d 996 (N.D. Ill. 2015), which involved claims of price manipulation, not spoofing, does not demand otherwise. Defendants' argument (MTD at 19–20) is premised on a misconstruction of law and a blatant disregard of the allegations in the Amended Complaint.

Spoofing in violation of Section 4c(a)(5)(C) is, on its face, a prohibited practice defined by intent, without reference to any effect or lack thereof. *See, e.g.*, *Skudder*, 2022 WL 17752392, at *6 ("To state a claim for spoofing, the CFTC must allege that [the defendant] bid or offered 'with the intent to cancel the bid or offer before execution.'" (quoting 7 U.S.C. § 6c(a)(5)(c))); *Oystacher*, 203 F. Supp. 3d at 942 ("The Spoofing Statute forbids and parenthetically defines spoofing as 'bidding or offering with the intent to cancel the bid or offer before execution.' The CFTC, through [the] aggregate trading patterns, alleges a plausible claim that he did exactly that." (quoting 7 U.S.C. § 6c(a)(5)(c))).

Nor does Section 6(c)(1) or Regulation 180.1 require any market effect to establish a violation, as was made clear at the time of Regulation 180.1's issuance:

> The foregoing should not be interpreted . . . to mean that a violation of final Rule 180.1 necessarily requires proof of a market or price effect . . . . *It does not*. A market or price effect may well be indicia of the use or employment of a manipulative or deceptive device or contrivance; nonetheless, *a violation of final Rule 180.1 may exist in the absence of any market or price effect*.

Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398-01, 41401 (July 14, 2011) (emphases added).  The observation in *Coscia* cited by Defendants that spoofing "differs from legitimate trading . . . , in that it can be employed to *artificially move* the market price of a stock or commodity" does not mean that spoofing *must* cause an artificial price movement to constitute a violation of Sections 4c(a)(5)(C) or 6(c)(1) or Regulation 180.1.  (MTD at 19 (citing *Coscia*, 866 F.3d at 787).)  To read in such a requirement would all but eliminate the distinction between these provisions and others that expressly prohibit price manipulation.  *See, e.g.*, 7 U.S.C. § 13(a)(2); 17 C.F.R. § 180.2 (2023).  Instead, it is the false indication to the market of an intent to trade at a particular quantity and price that is prohibited.  *See Shak*, 2023 WL 5717289, at *7 ("[T]he detailed allegations concerning Defendant's Spoof Orders . . . sufficiently alleged that Defendant made a misrepresentation designed to inject inaccurate information into the market.").  A finding that spoofing constitutes the use of a manipulative or deceptive device does not depend on whether market participants acted on the misleading information.  *See id.* at *8 (noting the CFTC "is not required to . . . allege reliance" and finding allegations "that signals of supply and demand are important to market participants" and of "how the injection of false signals of supply and demand impacts their decision making" satisfy the materiality requirement).

Moreover, Section 6(c)(1) and Regulation 180.1 impose liability for an attempt, whether or not the conduct resulted in any market impact.  *See Koch v. SEC*, 793 F.3d 147, 153–54 (D.C. Cir. 2015) ("[I]ntent—not success—is all that must accompany manipulative conduct to prove a violation [in the securities context].");  *cf. SEC v. Fiore*, 416 F. Supp. 3d 306, 326 (S.D.N.Y.

2019) (rejecting argument that SEC failed to state a market manipulation claim under Rule 10b-5 because the complaint did not "allege that the trading activity *actually* impacted the market," noting that "courts have upheld market-manipulation-based enforcement actions on manipulative intent alone"); *SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 60 (S.D.N.Y. 2017) ("Nor does manipulative conduct need to be successful in order to violate the securities laws.").

Even if the Court were to impose the requirements for a price manipulation—rather than spoofing—claim, both cases on which *Kraft* relied in describing market impact as an element of price manipulation were brought by private litigants, who, unlike the CFTC, are required to plead damages. *Kraft*, 153 F. Supp. 3d at 1011–12 (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101–02 (2d Cir. 2007), and *DH2, Inc. v. Athanassiades*, 404 F. Supp. 2d 1083 (N.D. Ill. 2005)). Therefore, the adoption of market impact as an element in *Kraft* does not require its adoption, as a general rule, in all anti-fraud actions by the Commission, even in the absence of allegations of actual price manipulation. *See CFTC v. S. Tr. Metals, Inc.*, No. 14-22739, 2016 WL 4523851, at *5–6 (S.D. Fla. Aug. 29, 2016), *aff'd in relevant part*, 894 F.3d 1313 (11th Cir. 2018) (holding, in non-price-manipulation case, that CFTC need not prove reliance or loss causation under Section 6(c) or Regulation 180.1). As the *Kraft* court itself observed, "[T]he exact pleading requirements for a cause of action under [the analogous] Section 10(b) vary depending on the type of claim alleged." 153 F. Supp. 3d at 1011.

Nonetheless, even if the Commission were required to plead an effect on the market, it has done so here. The Amended Complaint alleges how Defendants' Spoof Orders created a false impression of supply and demand and could have influenced decisions of other market participants. (AC ¶¶ 1, 49–55, 60–62). It also alleges that Defendants' scheme was "designed to trick other market participants into entering higher bids or lower offers, allowing Defendants to

execute orders . . . at advantageous prices" (*id.* ¶ 1), and that "Serotta intended his spoofing activity to put pressure on the price in the direction of his Genuine Orders" (*id.* ¶ 54). Furthermore, for Spoof Event Examples 1–3, the Amended Complaint provides specific details as to the impact the relevant Spoof Order had on the market depth and the resulting market reaction in the filling of Genuine Orders. (*Id.* ¶¶ 70–82.)

**E.      The Amended Complaint States Claims for Failure to Supervise (Count III) and Violation of the 2017 Order (Count IV)**

The Court should reject Defendants' argument that the failure to supervise claim under Regulation 166.3 must be dismissed for failure to allege an underlying violation (MTD at 21–22),[9] because a violation of Regulation 166.3 is "an independent violation for which no underlying violation is necessary." *In re Interactive Brokers LLC*, CFTC No. 22-18, 2022 WL 20358892 (June 30, 2022); *see also In re GNP Commodities, Inc.*, CFTC No. 89-1, 1992 WL 201158, at *17 n.11 (Aug. 11, 1992) (same), *aff'd in part and modified sub nom. Monieson v. CFTC*, 996 F.2d 852 (7th Cir. 1993). In any case, as described in detail above, the Amended Complaint plainly does allege underlying violations of Counts I and II.

Defendants also challenge the CFTC's "failure to supervise claims [that] rely *in part* on allegations that Logista failed to properly supervise trading conducted on ICE Europe," because the Act and Regulation 166.3 do not extend extraterritorially to Logista's trading on IFEU. (MTD at 21–22 (emphasis added).) Again, Defendants are wrong. The alleged misconduct—the acts or omissions supporting the supervisory failures—occurred in Houston, Texas, where

---

[9] Defendants' reliance on *In re FSI Futures, Inc.*, CFTC No. 95-9, 1997 WL 693554, at *12 n.90 (Aug. 1, 1997), to suggest that the Commission has never imposed liability under Regulation 166.3 in the absence of an underlying violation is out of date. The Commission has brought actions in which the sole charge was a violation of Regulation 166.3, including the 2017 Order charging Logista with violating Regulation 166.3. *See also In re Interactive Brokers LLC*, CFTC No. 22-18, 2022 WL 20358892 (June 30, 2022) (charging only under Regulation 166.3).

Logista has its place of business and where Serotta resides. (AC ¶¶ 13, 14.) Regulation 30.4(c) requires that any U.S.-based commodity pool that trades in foreign futures or options be registered with the Commission as a commodity pool operator ("CPO"), and Regulation 30.4(d) sets forth a parallel requirement for commodity trading advisors ("CTA"). 17 C.F.R. § 30.4(c), (d) (2023). Regulation 166.3 in turn requires a registrant to diligently supervise, *inter alia*, "**all other activities** of its partners, officers, employees and agents . . . **relating to its business as a Commission registrant**."[10] *Id.* § 166.3 (emphases added). Moreover, the Act contains a clear statement of extraterritoriality regarding any foreign board of trade ("FBOT") that provides trading access to U.S. persons. 7 U.S.C. § 6(b).[11] Here, the Amended Complaint alleges that Logista is registered with the Commission as a CPO and CTA (AC ¶ 13), and that it failed to diligently supervise, from the United States, the disruptive trading conducted by Logista on CME and IFEU, the latter of which is "registered as a foreign board of trade pursuant to Section 4(b)(1) of the Act, 7 U.S.C. § 6(b)(1) and Part 48 of the Regulations" (*id.* ¶ 17).

---

[10] The Amended Complaint does not allege substantive claims for spoofing or a manipulative or deceptive device based on Logista's trading on IFEU. None of the authorities cited by Defendants addresses *supervisory misconduct* by a Commission registrant, rendering them inapposite.

[11] This Section allows the Commission to adopt rules and regulations requiring the registration of any FBOT that provides trading access to persons located in the United States, which it has done in Part 48, 17 C.F.R. Pt. 48 (2023). Specifically, FBOTs may register with the Commission "to permit the members and other participants of the [FBOT] that are located in the United States to enter trades directly," to the extent that they are: (1) entering orders for their proprietary accounts; (2) registered as a futures commission merchant; or (3) registered as a CPO or CTA or exempt from such registration, and are submitting orders on behalf of a U.S. pool for U.S. customers. *Id.* § 48.4(b). Here, Logista, as a registered CPO and CTA, was allowed to trade pool accounts on the FBOT *only pursuant to* its status as a registrant. As such, when trading on IFEU, Logista was necessarily conducting business as a Commission registrant. Further, under Regulation 48.8(a)(5)(i), any unregistered United States–based participant given direct access to an FBOT's trading system is required to file a written representation that it submits to Commission jurisdiction. *Id.* § 48.8(a)(5)(i). Thus, even if Logista were unregistered, it would have submitted to Commission jurisdiction for trading on IFEU.

The factual allegations supporting Count III allege the same type of misconduct that the Commission found had violated Regulation 166.3 in the 2017 Order.[12] In consenting to the entry of the 2017 Order, Logista "[a]dmit[ted] the jurisdiction of the Commission" with respect to not only that Order, but also "*any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order*." 2017 Order, at \*4 (emphasis added).

Finally, the Court should reject Defendants' motion to dismiss Count IV for the purported reason that so-called "obey-the-law" provisions are unenforceable. Defendants fail to cite controlling Seventh Circuit precedent, *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 842 (7th Cir. 2013), which recognizes that "obey-the-law" injunctions are appropriate under certain circumstances, and instead rely on non-binding decisions by the Eleventh Circuit and the Middle District of Florida. (MTD at 23.) In *AutoZone*, the court recognized that while "a request for an obey-the-law injunction must be evaluated with great care[,] this type of injunction will be an 'appropriate' form of equitable relief . . . only where the evidence suggests that the proven illegal conduct may be resumed." 707 F.3d at 842. Here, the Amended Complaint sufficiently alleges that Logista was ordered to cease and desist from further violations of Regulation 166.3 under the 2017 Order, and that Defendants have again engaged in spoofing, manipulative and deceptive trading practices, and related supervisory failures in 2020. (AC ¶¶ 25–30.)

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

---

[12] Without admitting or denying the findings or conclusions therein, Logista consented to findings in the 2017 Order that a former employee engaged in spoofing on a foreign futures exchange in August 2014, and that Logista "lacked any procedures for the detection and deterrence of disruptive trading by its agents," and agreed to cease and desist from violating Regulation 166.3. 2017 Order, at \*1 & n.1, \*2, \*5.

Dated: January 16, 2024

COMMODITY FUTURES TRADING
COMMISSION

By: */s/ Meredith Borner*

Meredith Borner (*pro hac vice*)
Lara Turcik (*pro hac vice*)
Trial Attorneys
mborner@cftc.gov
lturcik@cftc.gov

Patryk Chudy (*pro hac vice*)
Chief Trial Attorney
pchudy@cftc.gov

Manal M. Sultan (*pro hac vice* pending)
Deputy Director
msultan@cftc.gov

290 Broadway, 6th Floor
New York, NY 10007
Phone: (646) 746-9700
Fax: (646) 746-9888

Katherine Paulson
Trial Attorney
kpaulson@cftc.gov

Commodity Futures Trading Commission
Division of Enforcement
77 West Jackson Boulevard, Suite 800
Chicago, IL 60604
Phone: (312) 596-0700
Fax: (312) 596-0716
ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION