IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>    Plaintiff,<br><br> v.<br><br>LOGISTA ADVISORS LLC and ANDREW HARRIS SEROTTA,<br><br>    Defendants. | Case No. 1:23-cv-07485<br><br>Hon. John F. Kness |

**DEFENDANTS' REPLY
IN SUPPORT OF THEIR RULE 12(b)(6) MOTION TO DISMISS
<u>PLAINTIFF'S AMENDED COMPLAINT</u>**

Thomas K. Cauley, Jr. (ARDC No. 6185259)
tom@cauleylawgroup.com
Cauley Law Group LLC
521 Morris Lane
Hinsdale, IL 60521
(312) 493-8970

and

Steven E. Sexton (ARDC No. 6287356)
ssexton@sidley.com
Thomas A. Weber (ARDC No. 6336929)
tweber@sidley.com
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
(312) 853-7000

***Attorneys for Defendants***

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................................. 1

LEGAL STANDARDS ........................................................................................................................ 5

ARGUMENT ......................................................................................................................................... 5

I. THE CFTC'S CLAIMS DO NOT SATISFY RULE 9(b) AND FAIL TO ADEQUATELY ALLEGE SCIENTER. .............................................................................. 5

    A.    The Trading Activity Associated with Each of the CFTC's Four Spoofing Parameters Is Legitimate Trading Activity. .............................................................. 5

    B.    The CFTC's Two Fill Rate Comparisons Do Not Support Spoofing. ..................... 8

    C.    The CFTC Has Not Alleged Any Facts to Support Its Conclusory Assertion That Logista's Orders Had a "Very Low Risk" of Execution. ............................. 10

    D.    The CFTC's Five Examples Are Insufficient to State a Spoofing Claim. ............. 10

    E.    The Fact That So-Called "Large Spoof Orders" Were in the Market for a Median of 52 Seconds and as Long as Up to Three Minutes Undercuts the CFTC's Spoofing Claim. ....................................................................................... 11

    F.    The Amended Complaint Does Not Allege What Impact the "Large Spoof Orders" Purportedly Had on the Market. ............................................................. 12

II. THE CFTC'S COUNTS III AND IV FOR FAILURE TO SUPERVISE SHOULD BE DISMISSED. ..................................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amaranth Nat. Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008)...................................................................................10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................................................5

*CFTC v. Kraft Foods Grp., Inc.*,
    153 F. Supp. 3d 996 (N.D. Ill. 2015) ..........................................................................4, 12, 13

*CFTC v. Oystacher*,
    203 F. Supp. 3d 934 (N.D. Ill. 2016) .......................................................................................7

*CFTC v. Shak*,
    2023 WL 5717289 (D. Nev. Sept. 5, 2023) .........................................................................7, 8

*CFTC v. Skudder*,
    2022 WL 17752392 (N.D. Ill. Dec. 19, 2022) ............................................................7, 12, 14

*EEOC v. AutoZone, Inc.*,
    707 F.3d 824 (7th Cir. 2013) .................................................................................................15

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)...........................................................................................................13

*Lorenzo v. Sec. & Exch. Comm'n*,
    139 S. Ct. 1094 (2019)...........................................................................................................13

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010)...............................................................................................................14

*United States v. Coscia*,
    866 F.3d 782 (7th Cir. 2017) ........................................................................................3, 5, 8

*United States v. Smith*,
    2023 WL 8230811 (N.D. Ill. Aug. 21, 2023) ........................................................................12

*United States v. Smith*,
    555 F. Supp. 3d 563 (N.D. Ill. 2021) .....................................................................................13

**Other Authorities**

CME Group Market Regulation Advisory Notice RA2107-5 (Aug. 2, 2021)..................................6

Gideon Mark, *Spoofing and Layering*, 45 J. Corp. L. 399 (2020)..................................................10

**INTRODUCTION**

The CFTC contends that Logista intended to cancel 200+ contract orders – the so-called "Large Spoof Orders" – at the time they were placed based on a supposed "pattern" of trading. But the CFTC fails to explain, as required by Rule 9(b), *how* that "pattern" of trading differs from legitimate trading activity, including from the so-called "Large *Non*-Spoof Event Orders" (herein referred to as the "Large *Non*-Spoof Orders"). The CFTC points to two fill rate statistics, but those statistics are meaningless because the CFTC arbitrarily defined "Large Spoof Orders" to achieve those statistical results; those statistics do not explain why some orders are allegedly spoof orders while other similar orders are not. The CFTC's five "examples" merely describe five different trading episodes, but again fail to explain why that trading differs from legitimate trading. Because the CFTC has not alleged facts that distinguish "Large Spoof Orders" from legitimate trading activity (and, in particular, from "Large *Non*-Spoof Orders"), the Court cannot reasonably infer that Logista intended to cancel orders at the time they were placed.

The CFTC alleges that Logista's so-called "Large Spoof Orders" had the following four characteristics as "parameters": (1) the "Large Spoof Orders" were resting orders to buy or sell 200 or more futures contracts that were "protected from execution" behind other orders in the order book, (2) subsequently, smaller orders were placed on the other side of the market (the so-called "Genuine Orders"), (3) the "Genuine Orders" were filled in whole or part, and (4) the so-called "Large Spoof Orders" were canceled within three minutes. The CFTC admits that each of these four parameters – both standing alone and in combination with other parameters – is observed in trading activity that is entirely legitimate. There is nothing improper with placing 200+ contract resting orders, even if they happen to be behind other orders in the order book – which undisputedly happens all the time. There is nothing improper with having larger orders on one side of the market and smaller orders on the other side of the market at the same time. And

1

there is nothing wrong with canceling orders – indeed, most orders are canceled.

The CFTC can point to nothing from which the Court could infer that Defendants intended to cancel orders at the time they were placed. Instead, the CFTC makes the circular argument that Defendants' intent to cancel the "Large Spoof Orders" at the time they were placed can be inferred because in their "totality, Defendants' actions establish a pattern of trading" that fit the CFTC's four "parameters." Dkt. 36 at 7 ("Resp.").[1] The CFTC's circular argument is also conclusory and fails to satisfy the particularity requirements of Rule 9(b). The CFTC is required to allege *facts* from which the Court can reasonably infer that Logista intended to cancel orders at the time they were placed. Nothing about the four parameters the CFTC identified – in isolation or in combination – suggests that Logista intended to cancel any order at the time it was placed.

Central to the CFTC's claims is the allegation that Logista knew that its "Large Spoof Orders" had a "very low risk of filling" because they were "protected from execution" by their placement in the order book. But the CFTC never alleges any facts to support that allegation, such as *how* "Large Spoof Orders" were any more "protected from execution" than "Large *Non*-Spoof Orders." Indeed, the CFTC never alleges that Logista placed "Large Spoof Orders" any differently from how it placed legitimate orders, including the "Large *Non*-Spoof Orders." The CFTC's only response is that it is "not required to allege additional information or statistics" to support its allegations, Resp. at 20, which, of course, is incorrect.

The CFTC's comparison of the fill rates of "Large Spoof Orders" and "Large *Non*-Spoof Orders" does not support an intent to cancel orders at the time the orders were placed. The "Large *Non*-Spoof Orders" have higher fill rates simply because the CFTC labels all of Logista's

---

[1] Page references to the CFTC Response and Defendants' Opening Brief are to the docket page numbers.

200+ contract orders that were fully filled, including those opposite smaller orders, as "Large *Non*-Spoof Orders" – acknowledging that if an order was fully filled, Logista must not have intended to cancel that order at the time it was placed. Not surprisingly, by labeling all 200+ contract orders that were fully filled as "Large *Non*-Spoof Orders" the fill rate for "Large *Non*-Spoof Orders" is higher than for "Large Spoof Orders." The CFTC's statistics are meaningless.

The "Large Spoof Orders" were resting orders. The CFTC suggests, preposterously, that there is something suspicious about a larger resting order that ends up being canceled because it was not filled. The CFTC argues that aggressive orders (orders that cross the bid-ask spread and are usually filled immediately) "connote" an intent to fill, implying that a resting order (orders that do not cross the bid-ask spread and are therefore often not filled) connotes an intent to spoof. But resting orders are commonplace and entirely legitimate. An inference that Logista intended to cancel an order at the time it was placed plainly cannot be drawn from the fact that Logista placed resting orders. In fact, approximately 60% of Logista's "Large *Non*-Spoof Orders" were also resting orders. Am. Compl. ¶ 65 n.3. Nor does the CFTC dispute that most orders – indeed, up to 90% of all orders – are canceled. *E.g., United States v. Coscia*, 866 F.3d 782, 793 (7th Cir. 2017). It was entirely outside of Logista's control whether its 200+ contract resting orders were filled.

Finally, the CFTC's five hand-picked examples simply describe five trading scenarios that satisfy the CFTC's four parameters. But there is nothing remarkable about those scenarios, and nothing to suggest that Logista entered orders in those scenarios with the intent to cancel them. The alleged "Large Spoof Orders" in those five scenarios were open in the market for a sufficient time to execute – in some examples over 1 minute, which the CFTC does not dispute is an eternity in these futures markets. The Amended Complaint alleges that in three examples

3

Logista placed "Large Spoof Orders" at the "best" or "second-best price level" and that those orders constituted a significant portion of the order volumes at those price levels. Am. Compl. ¶¶ 72, 76, 80. But the Amended Complaint fails to explain what is wrong with that trading. Placing an order at the best, or even second best, price level is commonplace and is consistent with an intent for the order to execute, and is clearly legitimate behavior. Nor is there anything wrong with having an order constitute a significant portion of the order volume. Indeed, the CFTC never alleges that "Large *Non*-Spoof Orders" were placed any differently, or that "Large *Non*-Spoof Orders" did not also constitute a significant portion of the order volumes at the price level at which "Large *Non*-Spoof Orders" were placed. In short, the CFTC has failed to allege how Logista's "Large Spoof Orders" differed from legitimate trading activity, and has failed to allege facts from which this Court could reasonably conclude that Logista never intended for the "Large Spoof Orders" to execute.

The CFTC is also wrong that it does not need to allege market impact to state a manipulation claim. The Court expressly held in *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1012 (N.D. Ill. 2015) that to state a claim under Section 6(c)(1) and Regulation 180.1 – which are the claims the CFTC alleges in Count II – the CFTC "must plead … what effect the scheme had on the market for the commodities at issue." Because the CFTC failed to plead such an effect, Count II should be dismissed. Moreover, the CFTC alleges repeatedly that defendant Serotta was a sophisticated trader who knew how to obtain the results he sought in the market. But the Amended Complaint stops short of ever alleging that anyone in the market was actually tricked or deceived by Serotta's so-called "Large Spoof Orders" – even once. The CFTC's failure to allege any market impact undercuts the CFTC's contention in Count I that Serotta engaged in a supposed pattern of trading to "spoof" the market to his benefit.

4

Finally, because the CFTC fails to allege any underlying wrongdoing, its Counts III and IV for failure to supervise supposed wrongdoing should be dismissed. Further, the failure-to-supervise regulation does not extend extraterritorially to supervision of foreign futures trading on ICE Europe. Count IV's "obey-the-law" provision is also unenforceable, as it fails to pass muster even under the sole case the CFTC cites.

## LEGAL STANDARDS

The Amended Complaint does not even satisfy Rule 8(a)'s more permissive pleading standard, which requires the CFTC to allege facts sufficient to allow the Court to "draw the reasonable inference that [Logista] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Amended Complaint certainly fails under the more stringent requirements of Rule 9(b), which requires the CFTC to allege the "who, what, when, where, and how of the fraud." Resp. at 11. As the CFTC recognizes, "'Rule 9(b) should be applied with an eye toward fulfilling the Rule's underlying purposes'—including informing Defendants of the claims against them and enabling them to form an adequate defense." *Id.* To state a spoofing claim, the CFTC must allege that Logista placed orders with the "intent to cancel" those orders "*at the time they were placed.*" *Coscia*, 866 F.3d at 794 (emphasis added). While Defendants' state of mind may be alleged generally, the CFTC's Amended Complaint "must allege 'sufficient underlying facts from which a court may reasonably infer that [Defendants] acted with the requisite state of mind,'" Resp. at 11–12, which the CFTC has failed to do.

## ARGUMENT

I. **THE CFTC'S CLAIMS DO NOT SATISFY RULE 9(b) AND FAIL TO ADEQUATELY ALLEGE SCIENTER.**

A. **The Trading Activity Associated with Each of the CFTC's Four Spoofing Parameters Is Legitimate Trading Activity.**

The CFTC does not dispute that there is nothing improper about any of the four

"parameters" that the CFTC claims identify spoofing orders. There is nothing wrong with (1) placing 200+ contract resting orders, even if they are behind other orders, (2) simultaneously placing orders on both sides of the market, (3) placing orders on opposite sides of the market in unequal quantities, or (4) canceling orders. Dkt. 29 at 15–20 ("Br."). CME guidance recognizes that simultaneous orders on both sides of the market, even in unequal quantities, are perfectly legitimate.[2] And there is nothing improper with canceling orders – most orders are canceled.

Rather than argue that any of its four parameters constitutes improper conduct, the CFTC vaguely argues that "when viewed in their totality, Defendants' actions establish a pattern of trading … that supports an inference that [Logista] placed hundreds of orders with the intent to cancel …." Resp. at 7–8. But the CFTC admits that Logista placed orders with *combinations* of these four parameters that are *not* "Large Spoof Orders," but rather "Large *Non*-Spoof Orders." Am. Compl. ¶ 65 n.3. Specifically, the CFTC does not dispute that "Large *Non*-Spoof Orders" included (1) resting orders for 200+ contracts, (2) that were opposite smaller "Genuine Orders," and (3) that those 200+ contract orders were canceled. In those situations where several of the "parameters" were met, the CFTC concluded that the orders were "Large *Non*-Spoof Orders" either because the orders were canceled after three minutes, or they were canceled before three minutes but no "Genuine Orders" on the opposite side of the market were filled. Br. at 12–13. Thus, an order can meet most of CFTC's parameters and be a legitimate "*Non*-Spoof Order." The Amended Complaint fails to allege *how* Logista's alleged spoof orders were meaningfully different from other orders Logista entered that the CFTC admits were legitimate. For example, how could an order canceled after two minutes and forty-eight seconds be a spoof order but an

---

[2] CME Group Market Regulation Advisory Notice RA2107-5, at 4 (Aug. 2, 2021) (explaining that market participants are not "prohibit[ed] from making a two-sided market with unequal quantities" and describing an order imbalance created by the same trader of "100 bid" on one side of the market and "10 offered" on the other side as legitimate market activity).

6

order canceled after three minutes not be a spoof order? The CFTC's argument that the Court should look to the "totality" of its allegations to determine what is an alleged spoof-order is an attempt to sidestep the particularity requirement of Rule 9(b).

In response to Logista's arguments regarding the "Large *Non*-Spoof Orders," the CFTC backtracks and claims that "[n]owhere does the Amended Complaint bless Serotta's LNSEO [Large *Non*-Spoof Orders] as 'legitimate.'" Resp. at 15, 17. Blurring the distinction between alleged spoof orders and legitimate orders even further, the CFTC now argues that its definition of a "Large Spoof Order" may be "underinclusive," and "Large *Non*-Spoof Orders" may be spoof orders too. *Id.* However, the Amended Complaint expressly defined certain 200+ contract orders as "Large *Non*-Spoof Event Orders," and specifically alleged that those orders "were *not* part of Spoof Events[.]" Am. Compl. ¶ 65. But, more importantly, the CFTC's attempt to backtrack, and to now suggest that the "Large *Non*-Spoof Orders" may also be spoof orders, highlights the fact that the CFTC's four-parameter criteria is arbitrary and nonsensical.

The CFTC argues that "courts have consistently held that complaints alleging facts comparable to those in the Amended Complaint" state spoofing claims. Resp. at 20. But the caselaw the CFTC cites does not support that contention. *Oystacher* solely involved a challenge to whether the spoofing statute was unconstitutionally vague, which is not an argument Logista makes here. *CFTC v. Oystacher*, 203 F. Supp. 3d 934 (N.D. Ill. 2016). In *Skudder*, the defendants waived their Rule 9(b) argument, and thus the Court did not address the Rule 9(b) argument that Logista makes here. *CFTC v. Skudder*, 2022 WL 17752392, at \*6 n.16 (N.D. Ill. Dec. 19, 2022). Finally, in *Shak*, the Court rejected the defendant's argument that the CFTC's spoofing complaint failed to satisfy Rule 9(b) because it did not allege the "who, what, when, where, and how" for *each* of the 1,808 orders alleged in the Complaint, which is also not an

7

argument Logista makes. *CFTC v. Shak*, 2023 WL 5717289, at *3 (D. Nev. Sept. 5, 2023).³ In short, under Rule 9(b), the Amended Complaint fails to state spoofing and manipulation claims.

### B. The CFTC's Two Fill Rate Comparisons Do Not Support Spoofing.

The CFTC argues that the different fill rates for "Large *Non*-Spoof Orders" and "Large Spoof Orders" support the inference that Logista intended to cancel the "Large Spoof Orders" at the time those orders were placed. Resp. at 15. However, the disparity in fill rates is no surprise – the CFTC labeled all orders that were fully filled as "Large *Non*-Spoof Orders." By doing so, the fill rate for "Large *Non*-Spoof Orders" would understandably be higher than the fill rate for "Large Spoof Orders." But whether Logista's 200+ contract resting orders are fully filled is up to other market participants. The Amended Complaint also correctly recognizes resting orders such as the "Large Spoof Orders" are not guaranteed to execute. Am. Compl. ¶ 46. Indeed, more than half of the "Large *Non*-Spoof Orders" were also resting orders, and around 70% of those orders were also canceled. *Id.* ¶ 65 & n.3. Thus, the fact that Logista canceled certain 200+ contract orders because they failed to be fully filled after up to three minutes clearly is insufficient to infer that Logista intended to cancel those resting orders at the time the orders were placed.

The CFTC never alleges that the difference in fill rates between "Large Spoof Orders" and "Large *Non*-Spoof Orders" was the result of anything Logista did differently in placing orders. The different fill rates between the "Large Spoof Orders" and "Large *Non*-Spoof Orders"

---

³ The CFTC also cites *Coscia*, but the evidence presented in the *Coscia* trial is very different. In *Coscia*, the algorithm was specifically "designed to avoid large orders being filled," only 0.57% of Coscia's large orders were on the market for more than one second (whereas 65% of other large orders were open for more than a second), and Coscia's cancellations represented 96% of all Brent futures cancellations. 866 F.3d at 795–96. Here, Logista's orders were manual, and were left open in the market for up to three minutes, and there is no allegation that Logista canceled 200+ contract orders more frequently than other market participants.

8

– which result from the simple fact that the CFTC lumped all fully-filled 200+ contract orders into the "Large *Non*-Spoof Order" category – cannot possibly support an inference that Logista intended to cancel "Large Spoof Orders" at the time those orders were placed.

As to the second statistic, the CFTC does not dispute that the difference in fill rates between "Genuine Orders" and "Large Spoof Orders" is to be expected because the "Genuine Orders" consisted largely of "aggressive" orders, meaning, according to the CFTC, they "are guaranteed to execute, at least partially, immediately after being placed," Am. Compl. ¶¶ 45, 53, whereas the "Large Spoof Orders" were all "resting" orders that were "not guaranteed to execute," *id.* ¶¶ 46, 53. The CFTC weakly argues that "[e]ntering an order aggressively connotes an intent that the order fill," Resp. at 17, implying that resting orders connote an intent to spoof. But resting orders are perfectly legitimate orders, and the CFTC does not and cannot allege to the contrary. Indeed, approximately 60% of Logista's "Large *Non*-Spoof Orders" were also resting orders, Am. Compl. ¶ 65 n.3, and the Amended Complaint never alleges that Logista did not intend for those orders to fill.

Moreover, the CFTC does not dispute that the difference in fill rates between "Large *Non*-Spoof Orders" (less than 30%) and "Genuine Orders" (nearly 65%) is also large. The CFTC argues that it is "not obligated to explain why" the "Genuine Orders" and "Large *Non*-Spoof Orders" have such different fill rates. Resp. at 17. But that argument misses the mark. The very different fill rates between different types of legitimate orders that Logista admittedly intended to fill – smaller "Genuine Orders" and "Large *Non*-Spoof Orders" – show that comparing fill rates says nothing about whether a trader intended to cancel an order at the time the order was placed.

9

### C. The CFTC Has Not Alleged Any Facts to Support Its Conclusory Assertion That Logista's Orders Had a "Very Low Risk" of Execution.

The CFTC's claim that Logista intended to cancel the "Large Spoof Orders" at the time they were placed almost entirely hinges on the CFTC's conclusory allegation that those orders had a "very low risk" of execution, Am. Compl. ¶ 68, and were "protected from execution," Resp. at 8. However, the CFTC never alleges any facts from which to infer that the "Large Spoof Orders" in fact had a "very low risk" of execution, or that the risk of execution was any lower than it was for "Large *Non*-Spoof Orders." Br. at 22.

The CFTC simply argues that Logista knows how to place orders in a manner that ensures they are filled. *Id.* at 10–11. But the law certainly does not require traders to place orders only when they are assured that they will be filled.[4] Indeed, as the CME recognizes, most resting orders are not filled, and around 70% of Logista's "Large *Non*-Spoof Orders" were not filled and were therefore canceled.

### D. The CFTC's Five Examples Are Insufficient to State a Spoofing Claim.

The CFTC's description of orders Logista placed on five different days is not sufficient to satisfy the heightened pleading obligations of Rule 9(b). *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 539–40 (S.D.N.Y. 2008) (merely describing the factual details of a trade does not satisfy the heightened pleading obligations of Rule 9(b)). The CFTC does not allege how those examples differ from legitimate trading activity or allege how those examples give rise to an inference that Logista intended to cancel the "Large Spoof Orders" in those examples at the time the orders were placed.

---

[4] https://www.cmegroup.com/education/courses/things-to-know-before-trading-cme-futures/futures-order-types.html (explaining that resting (limit) orders may not be filled); Gideon Mark, *Spoofing and Layering*, 45 J. Corp. L. 399, 469 n.29 (2020) ("Limit orders comprise a significant percentage of all orders entered in … futures markets.").

In each of the examples, Logista kept its "Large Spoof Orders" at risk in the market for an extended period – approximately 17 seconds in the first example, over 1 minute in examples 2 and 3, and over 30 seconds in examples 4 and 5. Am. Compl. ¶¶ 71–97; Resp. at 20. The Amended Complaint does not allege that market participants did not have sufficient time to execute on those orders.

The Amended Complaint alleges that in three examples Logista placed "Large Spoof Orders" at the "best or second-best price level" and that the "Large Spoof Orders" constituted a significant portion of the order volumes at that price level. Resp. at 8. But placing an order at the best, or even second best, price level is consistent with an intent for the order to execute. The CFTC never alleges that the "Large *Non*-Spoof Orders" were not also placed at the "best and second-best price level," or that they did not also constitute a significant portion of the order volumes at the price levels at which they were placed.

Examples 4 and 5, in which the CFTC alleges Logista "flipped" its "Large Spoof Order" from one side of the market to the other side of the market, do not establish that Logista did not intend to execute the "Large Spoof Orders." The examples show that Logista bought (or sold) hundreds of futures contracts on the side of the market on which Logista placed its alleged "Large Spoof Order," thus showing that Logista *did* in fact intend for its "Large Spoof Orders" to execute. Am. Compl. ¶ 86.

    **E.**    **The Fact That So-Called "Large Spoof Orders" Were in the Market for a Median of 52 Seconds and as Long as Up to Three Minutes Undercuts the CFTC's Spoofing Claim.**

Leaving an order open in the market for an extended period, subject to execution risk, is plainly inconsistent with an intent to cancel an order at the time it was entered – particularly when placed at the best or second-best price levels as the CFTC alleges. Logista left its "Large Spoof Orders" open for execution for a median of 52 seconds, and as long as three minutes –

11

which the CFTC does not dispute is an "eternity" in these futures markets. Br. at 23.

Despite arguing that order cancellation time is "not determinative of intent," the CFTC contradictorily argues that Logista's intent to cancel the "Large Spoof Orders" can be inferred because those orders were canceled faster than "Large *Non*-Spoof Orders." Resp. at 16–17. However, because the CFTC defined "Large Spoof Orders" to include all orders canceled within three minutes and "Large *Non*-Spoof Orders" to include all orders canceled *after* three minutes (as well as orders that were filled and not canceled), the "Large Spoof Orders" will necessarily have shorter median cancellation times (52 seconds) than the "Large *Non*-Spoof Orders" (188 seconds) – a fact that the CFTC does not dispute in its Response. The CFTC's comparison is therefore meaningless.

The cancellation times that the CFTC cites in *Skudder* and *Smith* are not comparable to Logista's cancellation times. In *Skudder* and *Smith*, the median cancellation times were 10.38 seconds and 1.5 seconds, and as long as 30 seconds and 36 seconds, respectively, compared to Logista's median cancellation time of 52 seconds, and cancellation times as long as three minutes. *Skudder*, 2022 WL 17752392, at *7; *United States v. Smith*, 2023 WL 8230811, at *3 (N.D. Ill. Aug. 21, 2023). It is simply not plausible to allege that Logista intended to cancel orders *at the time the order was placed* that it left open, subject to execution risk, at or near the best bid or offer, for as long as three minutes.

F. **The Amended Complaint Does Not Allege What Impact the "Large Spoof Orders" Purportedly Had on the Market.**

The CFTC is wrong that its manipulation claim (Count II) does not need to allege market impact. The Court in *CFTC v. Kraft* expressly held that claims by the CFTC under Section 6(c)(1) and Regulation 180.1 – which are the claims the CFTC alleges here in Count II – "must plead … what effect the scheme had on the market for the commodities at issue." 153 F. Supp.

12

3d at 1012. The CFTC admits that *Kraft* "adopt[ed] … market impact as an element" of these claims, but unsuccessfully attempts to distinguish *Kraft* by claiming its holding only relates to price manipulation claims, not spoofing. Resp. at 23–25. *Kraft*'s holding is not so limited. But in any event, the CFTC *is* alleging price manipulation in this case. *E.g.*, Am. Compl. ¶ 52 (alleging spoofing is a strategy used to "manipulate market prices"); *see also United States v. Smith*, 555 F. Supp. 3d 563, 575 (N.D. Ill. 2021) ("[S]poofing is just another way to artificially and deceitfully manipulate market prices.").[5]

The CFTC's argument that it has pleaded "an effect on the market" is wrong. Resp. at 25. As the Response and Amended Complaint make clear, the CFTC has only alleged (incorrectly) that Logista's "Large Spoof Orders" "could have" affected the market. *Id.*; Am. Compl. ¶¶ 60–61 (alleging only that Logista's trading "*could* affect market activity" and "*could* mislead other market participants"); *id.* ¶ 1 (alleging only that the trading was "*designed* to trick other market participants," not that it did) (emphases added).[6]

The CFTC's failure to allege any actual market impact from Logista's "Large Spoof Orders" is directly relevant to whether the CFTC has sufficiently alleged facts from which to

---

[5] The CFTC argues that requiring conduct to "cause an artificial price movement" under these provisions "would all but eliminate the distinction between these provisions and others that expressly prohibit price manipulation." Resp. at 24. But "[i]t is hardly a novel proposition that different portions of the securities laws prohibit some of the same conduct." *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1102 (2019) (rejecting argument that securities law "provisions should be read as governing different, mutually exclusive, spheres of conduct"). The CFTC also cites its commentary on Regulation 180.1, but that commentary is not authoritative because Regulation 180.1 merely copies the language of Section 6(c). *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 n.5 (2019) (an agency gets no "special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language.").

[6] The CFTC incorrectly claims that it identified the "resulting market reaction" to Logista's orders in examples 1–3. Resp. at 26. Those three examples just set forth the chronology of Logista's trading activity on three days, and contain no allegation that Logista would not have been able to execute the "Genuine Orders" absent the "Large Spoof Orders." Without an allegation of what Logista's fill rate and price of the "Genuine Orders" would have been absent the "Large Spoof Orders," the CFTC has no basis to contend that Logista's "Large Spoof Orders" impacted the market.

13

infer an intent to cancel. In *Skudder*, the Court found the CFTC's trade examples were consistent with an intent to cancel because the CFTC alleged that Skudder's spoof orders "had an impact on the market" and the CFTC "specifie[d] the amount of resulting market pressure" from those orders. *Skudder*, 2022 WL 17752392, at *19 & n.20. Here, in contrast, the CFTC does not identify any actual impact that Logista's spoof orders had on the market, only that they *could have* impacted the market. While the CFTC argues that Serotta knew how to have his orders filled and engaged in a pattern of trading "designed to trick other market participants into entering higher bids or lower offers," Resp. at 25–26, the CFTC's complete failure to allege any market impact from that scheme undercuts the CFTC's contention that Serotta intended to cancel orders at the time he placed those orders to impact the market.

## II. THE CFTC'S COUNTS III AND IV FOR FAILURE TO SUPERVISE SHOULD BE DISMISSED.

Because the CFTC has failed to state a spoofing claim, the CFTC's failure-to-supervise claims fail too. Further, the failure-to-supervise claims relating to Logista's trading on ICE Futures Europe should be dismissed because CEA Regulation 166.3 does not apply extraterritorially. Br. at 26–27 (citing cases applying the presumption against extraterritoriality in comparable cases). The CFTC incorrectly contends that CEA Regulation 166.3 extends to Logista's supposed failure to supervise that foreign trading activity because the lack of supervision occurred in Houston and Logista is registered with the CFTC to trade foreign futures. But nothing in CEA Regulation 166.3 expresses any intent for it to apply to supervision of extraterritorial activities, and when a law "gives no clear indication of an extraterritorial application, it has none." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010). Moreover, the law is clear that conducting foreign trading from the United States is not sufficient to allow for the extraterritorial application of the CEA to that trading. Br. at 27 (citing, for

14

example, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182 (2d Cir. 2014) (federal securities laws did not apply extraterritorially to "purchases of foreign shares on foreign exchanges," even when those purchases were made in the United States)). Thus, just as the CEA does not apply to Logista's foreign futures trading, it does not apply to its supposed failure to supervise that foreign activity.

The CFTC contends that Logista admitted the CFTC's jurisdiction to bring Count III based on a 2017 settlement order. Resp. at 26. But that order is limited to actions "based on violation of or enforcement of this Order" for Logista's failure to supervise a former employee for trading in August 2014. 2017 Order, at *4; Br. at 27. This lawsuit is not an "enforcement action" for Logista's continued failure to supervise that former employee.

Finally, the "obey-the-law" provision in the 2017 settlement order with Logista is not enforceable under *EEOC v. AutoZone, Inc.*, 707 F.3d 824 (7th Cir. 2013). *AutoZone* describes the "concerns" with such obey-the-law provisions, including overbreadth (prohibiting more than the violation established in the instant case) and vagueness (failing to describe the acts restrained in reasonable detail), and directs that such provisions must be "evaluated with great care," "tailored to the particulars of the case," and include a "reasonable time limit." 707 F.3d at 824, 841–44 (reversing injunction without any time limit). The 2017 settlement order's obey-the-law provision is overbroad, vague, and not limited in time. It is thus unenforceable under *AutoZone*. Count IV should be dismissed for that independent reason.

## CONCLUSION

For the reasons described above and in Logista's opening brief, the Court should grant Logista's motion to dismiss the CFTC's Amended Complaint in its entirety with prejudice.

15

Date: January 30, 2024  Respectfully Submitted,

                                            CAULEY LAW GROUP LLC

                                      By: */s/ Thomas K. Cauley, Jr.*
                                            Thomas K. Cauley, Jr. (ARDC No. 6185259)
                                            tom@cauleylawgroup.com
                                            Cauley Law Group LLC
                                            521 Morris Lane
                                            Hinsdale, IL 60521
                                            (312) 493-8970

                                            Steven E. Sexton (ARDC No. 6287356)
                                            ssexton@sidley.com
                                            Thomas A. Weber (ARDC No. 6336929)
                                            tweber@sidley.com
                                            Sidley Austin LLP
                                            One South Dearborn
                                            Chicago, Illinois 60603
                                            (312) 853-7000

                                            ***Attorneys for Defendants***